ESTATE OF JOSEPH W. GISELMAN, DECEASED, HARRY W. GISELMAN, PERSONAL REPRESENTATIVE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Est. of Giselman v. Commissioner
Docket No. 5949-84.
United States Tax Court
T.C. Memo 1988-391; 1988 Tax Ct. Memo LEXIS 422; 55 T.C.M. (CCH) 1654; T.C.M. (RIA) 88391; August 22, 1988. *422 1. Value of stock in J. W. Giselman Corporation held by decedent at time of his death determined. 2. The value of real estate decedent transferred to a trust for the benefit of his wife and children many years before his death is not taxable in decedent's estate. Section 2036(a), I.R.C. 1954, as amended, not applicable. Gary R. DeFrang, for the petitioner. Randall E. Heath, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: In a notice of deficiency dated December 7, 1983, respondent determined a deficiency in petitioner's Federal estate tax in the amount of $ 45,921. *423 The deficiency was based in part on respondent's increase in the value of the stock of J. W. Giselman Corporation held by decedent at the time of his death. In an amendment to his answer, dated July 24, 1985, respondent claimed additional deficiencies in estate tax of $ 47,600, as a result of including in the taxable estate the value of real estate transferred to decedent's children prior to his death in which respondent determined decedent retained an interest. After concessions [1] the issues presented by the parties for decision are: (1) the fair market value of all the issued and outstanding stock in the J. W. Giselman Corporation held by the decedent on September 30, 1980; and (2) whether the decedent retained an interest in certain real property transferred to his children such that the value of the property is includible in the decedent's gross estate pursuant to section 2036. [2]
*424 For clarity, this opinion is divided into separate Findings of Fact and Opinion for each issue. Some of the facts have been stipulated. The Stipulation of Facts and exhibits thereto are incorporated herein by this reference. I) Fair market value of the stock of the Giselman Corporation FINDINGS OF FACT Joseph W. Giselman (hereinafter sometimes referred to as "Giselman" or as "decedent") died on March 30, 1980 at the age of 81. Giselman was domiciled in the state of Oregon at the time of his death. Harry W. Giselman and Sophie Hathaway are co-personal representatives of the estate of Giselman. Giselman's estate elected to value its "gross estate" using the alternate valuation date of September 30, 1980. At the date of his death, Giselman owned all of the issued and outstanding stock of J. W. Giselman Corporation (hereinafter sometimes referred to as the "Giselman Corporation" or simply as "the corporation".") The Giselman Corporation was formed by Giselman in 1954 and was the successor of a sole proprietorship he had operated since 1943. The offices and warehouse of the Giselman Corporation were located at 3446 N.E. Broadway, Portland, Oregon (the "Broadway property"). *425 Giselman was president of the Giselman Corporation and Sophie Hathaway served as Corporate Secretary. The principal business activity of the Giselman Corporation was installation of custom hardwood flooring in residential and commercial structures. Approximately 70 percent of the corporation's installation work was performed in residences and approximately 30 percent was performed in commercial structures. About 75 percent of the total residential installation work was performed in new homes with the balance being performed in remodeling of existing homes. Most of the new homes in which the corporation installed hardwood flooring were in the $ 80,000 or $ 90,000 price range; occasionally, an installation would be made in a new home costing $ 150,000 to $ 200,000. The machinery and equipment used by the corporation in its installation work consisted of sanders, edging machines, buffers, hand nailers, automobiles and trucks. During the period from 1976 through 1980, the total number of employees of the corporation ranged from 25 to 35. The corporation's installation work was obtained through a bidding process. The corporation became aware of potential projects when a prospective *426 customer called the corporate office and asked the corporation to review the project and make a bid on it. Giselman personally prepared all estimates. [3] Giselman obtained information as to potential commercial projects by visiting a project's "plant center" or through Giselman's direct contact with a general contractor responsible for work at the project. In other instances, jobs were obtained when Giselman contacted building contractors directly about the work. Giselman had been in the floor installation business since 1943, and was well known and liked in the construction business. He was actively involved in all aspects of the business of the Giselman Corporation until the day he died. His duties included the solicitation of business from contractors, preparation of installation estimates, the hiring and supervision of employees, visiting job sites to review the work in progress and the collection of accounts receivables from customers. He typically went to work at 6:30 a.m. to talk with his installers. After *427 the installation crews left to begin work, Giselman took calls from prospective customers and traveled to potential job sites to make estimates. He returned to the office at noon to make additional telephone calls and to meet with customers. He regularly returned to the shop by 4:30 p.m. to handle any matters which had arisen during his absence. The income and expenses of the Giselman Corporation for 1975 through and including 1979 are shown in Appendix "A". [4]
The Giselman corporation was a "smalll business corporation" (Subchapter 5 corporation) for Federal income tax purposes during the years 1975 and 1976. Accordingly, no Federal income tax was imposed at the corporate level of those years. Income reported on the corporate return for 1980 included a workman's compensation insurance refund in the amount of $ 23,681 received by the corporation from the State Accident Insurance Fund (SAIF), prior to September 30, 1980. The refund represented excess workman's compensation premiums paid by the corporation during 1978 and 1979. The income and expenses of the Giselman Corporation for *428 the short period ended September 30, 1980 are shown in Appendix "B". [5]
The balance sheets of the Giselman Corporation for 1975 through 1979 and the short period ended September 30, 1980 are shown in Appendix "C". The asset category labeled "land" on the September 30, 1980 balance sheet was property located near Mount St. Helens in the State of Washington. The land was damaged in the eruption of Mount St. Helens and had a fair market value of $ 3,900 on September 30, 1980. The asset category labeled "fixed assets" consists of machinery and equipment, vehicles and office equipment. The accounts receivable of the Giselman Corporation increased from $ 149,101.17 on March 31, 1980 to $ 180,821.23 on September 30, 1980. The business of the Giselman Corporation was affected by economic conditions in the housing market and home construction industry. The housing market and home construction industry were affected by interest rates with high interest rates having an adverse effect. On October 7, 1977 the prime interest rate, the rate banks charge their most credit-worthy *429 borrowers, was 7.5 percent. Thereafter the prime rate climbed, reaching a peak of 20.0 percent on April 2, 1980. It then began to retreat and reached a low of 11.0 percent on July 25, 1980. On September 30, 1980, the date of valuation, the prime rate was 13.0 pecent. The interest rate for conventional mortgages on new homes averaged 8.80 percent in 1977. That average rose steadily during 1978 and 1979. During December of 1979, the average rate was 13.26 percent. It rose steadily in the early part of 1980 but fell to a low of 11.84 percent in August 1980. The mortgage rate on the date of valuation, September 30, 1980, was 11.95 percent. A slump in home construction began in the Portland, Oregon area during 1979 and continued into 1980. National housing starts were 1,692,400 in 1978. In 1979 they fell to 1,582,900; by September of 1980 the rate was 1,482,000 units. On February 13, 1980 Giselman executed a will which disposed of all his property and gave instructions on what was to be done with the Giselman corporation upon his death. The will contained the following directions with regard to the corporation: (1) the corporation was to be liquidated within a reasonable *430 time after his death and the proceeds of the liquidation were to be distributed as part of the residue of Giselman's estate. The residue of the estate was to be distributed in equal shares to Giselman's three children and Sophie Hathaway; (2) the name "J. W. Giselman Corporation" and the right to do business thereunder, together with all customer lists and records, were to be given to Sophie Hathaway; (3) Sophie Hathaway was to be given three sanding machines, three sander-edgers, three buffers and one truck belonging to the corporation. Pursuant to the instructions of Giselman's will, the Giselman Corporation was dissolved and liquidated on January 1, 1981. Immediately following the liquidation of the corporation Sophie Hathaway formed a new and legally separate Oregon corporation called J. W. Giselman Corp. (hereinafter referred to as Giselman II"). Like the Giselman Corporation, Giselman II, is in the business of installing hardwood floors. The parties agree that the fair market value of the stock of the Giselman corporation is to be determined as of September 30, 1980. To establish the stock's fair market value, petitioner and respondent each presented the testimony of *431 an expert witness. Both experts prepared appraisal reports prior to trial and then testified at trial as to their conclusions and appraisal methods. Petitioner relied upon the appraisal report and testimony of Gregory Gilbert to establish the fair market value of the stock of Giselman Corporation on the valuation date. In his written report, Gilbert concluded that the stock of the Giselman Corporation on September 30, 1980 had a fair market value of $ 231,582. At trial, Gilbert increased his appraisal to $ 237,600. He concluded that the highest value for the corporation stock was indicated by its liquidation value because the will of Giselman stated that the Giselman Corporation was to be liquidated upon his death and because the management of the Giselman Corporation intended to comply with Giselman's instructions. [6] Gilbert placed liquidation values on all the assets of the company except the company name. He then made several adjustments to arrive at an "adjusted liquidating value" of $ 231,582." He next examined the income stream to determine if it could provide an indication of additional value for the intangible assets, which he concluded to be the goodwill associated *432 with the corporation. Gilbert concluded that it was "unlikely that significant goodwill would be allowed in the market place." Accordingly, he did not increase the adjusted liquidating value by any figure for goodwill. Gilbert confirmed the values reached by the liquidating approach by two separate valuation methods. These approaches capitalized income by (1) applying a multiple to the capitalized earnings of the corporation and (2) by estimating the maximum loan amount the company could support by using all of its earnings. In his capitalization of earnings approach, Gilbert considered the financial history of the Giselman corporation for taxable years 1975 through 1979, inclusive. [7] Gilbert began his analysis by examining the net taxable income for each of the five years as reported by the Corporation on its corporate income tax return. He then reduced taxable income by $ 16,800 annually to reflect the amount of rent he calculated the corporation would pay as fair rental value for the Broadway property (hereinafter defined). Gilbert next reduced 1978 and 1979 earnings by *433 nonoperating interest income realized in those years. After deriving an adjusted net income for the corporation for each of the five years he studied, Gilbert next reduced the earnings in each year by the Federal income tax he computed the corporation would have paid on its adjusted net income. Gilbert determined that the average net after tax income for the corporation for all five years was $ 28,651. He then multiplied this figure by factors of 5 and 7 to represent the earning capacity of the corporation, which he determined to be between $ 143,255 to $ 200,557. Finally, Gilbert added in the nonoperating assets, which he valued at $ 55,000, to produce the final value of the corporation of between $ 198,255 to $ 255,557 based on its current operating earning power. *434 Respondent relied upon the written report and testimony of Paul Clausen to support his determination as stated in the notice of deficiency. Clausen determined that the aggregate fair market value of the stock of the Giselman Corporation on September 30, 1980 was reasonably stated in the amount of $ 400,000. In his report, Clausen utilized the capitalization of earning method, the asset approach, and the liquidation value of the net tangible assets. Notwithstanding the alternate valuation approaches, Clausen's determination of value was "predicated primarily" on the capitalization of earnings approach. Clausen determined that the Giselman Corporation was a "growth corporation" whose earnings and profits could reasonably be expected to grow at a rate indicated by examining its most recent financial history. Accordingly, Clausen looked only at the corporation's 1977, 1978 and 1979 financial statements in determining the fair market value of the stock as of the valuation date. Clausen did not consider the company's earnings for 1975 and 1976 to be representative of its earning capacity. [8]
*435 In determining the corporation's operating income for 1977 through 1979, Clausen began with the corporation's taxable income reported on its corporate income tax return. He then excluded non-operating interest income in the amount of $ 3,959 in 1979 and $ 2,000 in 1978. Next, Clausen added in an imputed rent figure of $ 14,400 per year to represent the fair rental value of the Broadway property utilized by the corporation during the years in issue. Clausen next reduced operating income in both 1978 and 1979 by $ 11,840 each to adjust for the SAIF refund received by the corporation in February 1980. He then adjusted the Federal income tax expense for each year and subtracted it from operating income. To estimate the earnings capacity of the corporation, Clausen assigned the greatest weight to results of operations received in the most recent full year (1979) and progressively lesser weight to the results of prior years (1978 and 1977). Weighing factors of 3/6, 2/6 and 1/6 were assigned for the years 1979, 1978 and 1977, respectively. Applying his weighted-average approach, Clausen derived a weighted-average taxable income of the corporation during 1977 through 1979 of $ 67,942 *436 and a weighted average net income of $ 60,304. He then multiplied the weighted-average income by a factor of approximately 6.67 to reach the capitalized net income value of $ 402,027. He applied a multiple factor of 5.0 to the weighted-average taxable income to reach a capitalized value of taxable income of $ 339,710. Averaging the two, he determined that the average indicated value of net operating net assets was approximately $ 370,900. To this figure, Clausen then added total nonoperating assets valued at $ 74,300 to produce a final indicted value of the total enterprise based on its earning capacity of $ 445,200. OPINION We are confronted here with the opinion testimony of two experts in the field of business valuations. Respondent's expert determined that the fair market value of the stock of the Giselman Corporation on September 30, 1980 was $ 445,200 while petitioner's expert determined the value of the stock on the same date to be $ 237,600. There are differences, some of them significant, between the assumptions used by the experts in justifying their conclusions. However, there is a clearly identifiable common ground which emerges from each expert's testimony. *437 Petitioner's expert, Gilbert, was particularly helpful to the Court in outlining the similarities and differencies in the approaches taken by each expert. In characteristically candid testimony, Gilbert stated: There is a surprising lack of difference in our appraisal reports. The only difference of substance is the amount of earnings that we used when we capitalized earnings. Everything else we did was almost identical. The difference in the earnings number evidently springs from a difference in belief about what kind of company the Giselman Corporation was and what kind of an industry it's in. I believe that it was in a cyclical industry where cyclical peak occurred somewhere between 1977 and 1979, and we were about to go into a cyclical downturn, one that would be worse than normal but still a cyclical downturn. As a result of that, I used a 5 or 6 year average of earnings and computed it on an unweighted, straight arithmetic average basis and came up with a range of $ 20,000 to $ 30,000. Clausen believed that it is a growth company that had sustained growth from 1975 through 1977 to 1979, and that the only relevant earnings were the peak earnings of the period 1977 *438 through 1979. Since he believed it was a growth company, he correctly applied a weighted average to it and computed a value of somewhere around $ 60,000 or above. If one believes that it is a growth company, then Clausen's approach is correct. If, on the other hand, one believes that it's a cyclical company in a cyclical industry, then my approach is correct. [Emphasis added]. Although respondent criticizes the approach taken by Gilbert, he nevertheless recites, seemingly with approval, the above testimony of Gilbert. We find that Gilbert correctly identified the fundamental differences between the approaches taken by both experts in this case and we must now decide whether to accept Gilbert's analysis that at the date of valuation the Giselman Corporation was in a cyclical industry or whether, as Clausen urges, the Giselman Corporation was a growth company involved in a growth industry.
Opinion evidence is admissible on the question of value; however, it must be weighed in light of the demonstrated qualifications of the expert and all other evidence of value. Anderson v. Commissioner,250 F.2d 242, 249 (5th Cir. 1957), *439 affg. a Memorandum Opinion of this Court. We are not bound by the opinion of any expert witness when that opinion is contrary to our own judgment. Barry v. United States,501 F.2d 578 (6th Cir. 1974); Kreis' Estate v. Commissioner,227 F.2d 753, 755 (6th Cir. 1955), affg. a Memorandum Opinion of this Court; Tripp v. Commissioner,337 F.2d 432 (7th Cir. 1964), affg. a Memorandum Opinion of this Court. We may embrace or reject expert testimony, whichever, in our best judgment, is appropriate. Helvering v. National Grocery Co.,304 U.S. 282 (1938); Silverman v. Commissioner,538 F.2d 297, 933 (2d Cir 1976), affg. a Memorandum Opinion of this Court. We are not restricted to choose one valuation over the other, but may extract relevant findings from each in drawing our conclusions. See Chiu v. Commissioner,84 T.C. 722 (1985). After carefully reviewing all the evidence of record including the written reports of Clausen and Gilbert and their testimony at trial, we believe that with only slight modification Gilbert's capitalization of earnings valuation most accurately reflects *440 the fair market value of the stock of the Giselman Corporation on September 30, 1980. Although each party can cite figures which tend to support their position, we find based on all the facts and circumstances, that the hardwood flooring industry serviced by the Giselman Corporation as of the date of valuation was cyclical in nature rather than growth oriented. The parties agree, and we have so found, that a major portion of the Giselman Corporation's business was tied directly to new home sales in the Oregon area. Figures cited by both experts also confirm a relationship between home mortgage interest rates and the level of single family housing starts during the years in consideration. We agree with Gilbert's findings that due to increased interest rates and decreased housing starts the earnings of the Giselman Corporation began a cyclical downturn close to the valuation date. The weighted-average method employed by respondent's expert is therefore less reliable than Gilbert's straight arithmetic average method. Respondent's assertion that the decrease in new home renovations or installations was offset by an increase in the existing home installations is not supported by *441 the facts in this case. It is true that the Giselman Corporation was diversified to some degree through installation of hardwood floors in existing homes. However, existing home installations was a comparatively small part of the corporation's total work load. A careful reading of some of the evidence relied upon by Clausen to support his conclusion that the corporation was positioned in a growth industry seems instead to confirm the cyclical nature of the industry. Clausen stated he relied upon, and respondent entered into evidence, a June 1980 edition of Western Floors Magazine wherein retailers of hardwood flooring throughout the country gave their opinions as to the future of the retail hardwood flooring market in the country. Many of the retailers quoted in the article were enthusiastic about an increase in retail sales of hardwood flooring to the "do-it-yourselfers." The Giselman Corporation was involved exclusively in custom installations of hardwood floors. An increase in "do-it-yourself" home installation of hardwood floors would not mitigate against a downturn in the corporation's new home flooring installations. In addition, some retailers quoted stated that the *442 industry in 1980 was not as strong as it was in 1979; thus confirming a downturn in business in the year of valuation. One retailer stated: The hardwood market is still strong. It is not the rampant market that we experienced in 1979, but it is still a market with a good, firm base. The difference between today and yesterday: people are now quality conscious with the spiraling prices today, due to inflation and other factors that exist, the question is: how does a retailer get business that is available in 1980? We find that Clausen's review of the corporation's net operating income was too narrowly restricted to taxable years 1977 through 1979. Even if the Giselman Corporation were a "growth corporation" as was assumed by Clausen, neither Clausen nor respondent offered any explanation why the corporation's income for 1975 and 1976 should be excluded from Clausen's computations. Although we conclude that Gilbert's capitalization of earnings approach most closely reflects the fair market value of the Giselman Corporation as of the valuation date, nevertheless, two adjustments must be made to the figures stated in his appraisal report to reflect concessions made at trial and *443 stipulations of fact agreed to by the parties. [9] First, he imputed fair rental value of the Broadway property must be adjusted to account for the property's stipulated fair market value. [10] Both experts adjusted the taxable income of the corporation to reflect an imputed fair market rental of the Broadway property used by the Giselman Corporation during the years in issue. The parties stipulated that the fair market value of the Broadway property during the years in issue was $ 130,000 as opposed to the $ 140,000 figure used by Gilbert. [11] Substituting the $ 130,000 fair market value of the Broadway property into the formula otherwise used by Gilbert, we find that the imputed fair market rental value adjustment to the operating income of the Giselman Corporation for 1975 through 1979 is $ 15,600 annually. Second, Gilbert failed to adjust the net operating income of the corporation to reflect the SAIF refund received by the corporation in 1980, but which was attributable to premiums paid by the corporation during 1978 and 1979. Clausen correctly increased net income for 1978 and 1979 by one-half of the SAIF refund in each year. Accordingly, the operating income of the corporation *444 is increased by $ 11,840 in 1979 and by the same amount in 1978. When the above adjustments are incorporated into the calculations used by Gilbert, the fair market value of the stock of the Giselman Corporation on September 30, 1980 is determined to be $ 244,304.00, illustrated as follows: [12]
Item
1979
1978
1977
1976
1975
Reported taxable income
67,806 93,538 60,228 25,554 21,133 Less (-) imputed rent
(15,600)
(15,600)
(15,600)
15,600)
15,600)
Less (-) non-operating
interest income         (3,959)
(2,000)
0 0 0 Plus (+) refund of SAIF
premium         11,840 11,840 0 0 0 = Adjusted taxable income
60,087 87,779 44,628 9,954 5,533 Less (-) adjusted Federal
income tax expense         (12,276)
(28,634)
(9,318)
0 0 = Adjusted net income
47,811 59,145 35,310 9,954 5,533 Five year non-weighted
average
$ 31,550.60
Multiplied (X) by factor
of 6
$ 189,303.6 Plus (+) non-operating
assets
[13] 55,00.00
Total Value of stock
$ 244,303.60
*445 II) Retained Interest in Broadway Property FINDINGS OF FACT Helen I. Girard, Norman E. Giselman and Harry W. Giselman are the children of Joseph Giselman and his wife, Annie E. Giselman. Annie Giselman died in 1972. During 1947 through 1980 Giselman's sole proprietorship and the successor corporation, the Giselman Corporation, used the property at 3446b N.E. Broadway, Portland, Oregon (sometimes hereinafter referred to as the "Broadway property") as its office, shop and warehouse. The Giselman Corporation was the sole occupant of the building from 1955 through 1980. During the period from 1944 to 1955, Giselman and his wife jointly owned the Broadway property. On September 7, 1955, Joseph and Annie Giselman transferred all of their right, title and interest in the Broadway property to their three children, as trustees, to be held and administered in accordance with provisions of a trust agreement of the same date. Trust provisions included the following: (1) the beneficiaries of the trust were Annie Giselman, and the three Giselman children, Harry, Norman and Helen. Children of a deceased beneficiary were contingent beneficiaries; (2) the trustees were given the power *446 and authority to manage and control the trust's assets, but terms of the trust prevented the trustees from invading the trust corpus; (3) Joseph Giselman was to be allowed to rent the property upon payment of $ 200 per month for the months of September through December, 1955; and $ 200 per month for the year 1956 plus property taxes assessed against the property. For each year after 1957, he was granted an annual option to lease the property for an additional year "at such monthly rental as was agreed upon, but not to exceed $ 500 per month"; (4) equal distributions of trust income were to be made to the beneficiaries; (5) the trust was to continue during the lives of Annie and Joseph Giselman and the life of the last of their children to die; but the beneficiaries, by unamious consent in writing, could terminate the trust at any time after five years following the death of Annie Giselman and of Joseph Giselman. Upon termination of the trust, trust property was to be disbursed to the beneficiaries or their legal heirs. Upon termination, any real property in the trust was to be distributed to trust beneficiaries, and the legal heirs of a deceased beneficiary, as tenants in common; *447 and (6) an annual accounting was to be made, trust assets were not liable for claims of creditors of beneficiaries, and provisions were made for the resignation of the trustee and choice of a successor trustee. On the date Joseph and Annie Giselman transferred the Broadway property into trust, Joseph Giselman was 57 years of age. The three Giselman children, Harry, Norman and Helen, were 39, 36 and 34 years of age, respectively. On February 14, 1966, the trust established in 1955 was terminated and the Broadway property was conveyed to Harry Giselman, Norman Giselman and Helen Girard as tenants in common. The Giselman Corporation did not make cash rental payments to Harry Giselman, Norman Giselman or Helen Girard at any time after 1970. However, the Giselman Corporation continued to pay property taxes, maintenance and insurance on the Broadway property. During the period from 1970 through 1980, the building located on the Broadway property had structural defects and was in a state of disrepair. The structural deficiencies included the following: (1) the roof leaked and needed frequent repair; (2) there were holes from the outside to the inside of masonry walls of the *448 building; (3) the building was beginning to lean toward railroad tracks adjoining the property; (4) cross bars and ties were required to prevent ceiling beams from sliding out of pockets in the masonry; and (5) the building did not comply with the local fire code. In October 1980, Harry Giselman, Norman Giselman and Helen Girard offered the property for sale. On November 29, 1980, an agreement was reached for the sale of the Broadway property for $ 140,000. The sale closed on February 2, 1981. Harry Giselman, Norman Giselman and Helen Girard each reported gain from the sale of the Broadway property on their respective income tax returns for taxable year 1981. The Notice of Deficiency dated December 7, 1983 issued by respondent for this case proposed no adjustment pertaining to the Broadway property. In an amendment to his answer dated July 24, 1975, respondent asserted an increased deficiency in the amount of $ 47,600. The basis for this claim was that the Broadway property was includable in Giselman's estate under section 2036 because he allegedly retained for his life the possession or enjoyment of, or the right to income from the property. Respondent has the burden of *449 proof as to this issue raised for the first time in his amended answer. Rule 142(a). OPINION Respondent relies upon sec. 2036(a)[14] to support the inclusion of the value of the Broadway property in decedent's taxable estate. This section, inter alia, brings back into the taxable estate all property of which the decedent, without receiving adequate consideration, has made an incomplete transfer, in trust or otherwise, reserving to himself for his life the possession or enjoyment of, or the right to the income from, the property or the right to designate the beneficiary of such possession or enjoyment. To avoid inclusion, the transferor "must be left with no present legal title in the property, no possible reversionary interest in that title, and no right to possess or enjoy the property then or thereafter. In other words such a transfer must be immediate and out and out, and must be unaffected by whether the transferor lives or dies." Commissioner v. Estate of Church,335 U.S. 632, 645-646 (1949). *450 The section applies, however, only where the possession or enjoyment, or the right to income from, the property is "retained" at the time the transfer is made. It does not apply where arrangements, not previously contemplated, are made after a transfer has been completed to permit the transferor to enjoy the benefits of the property. See Estate of Beckwith v. Commissioner,55 T.C. 242 (1970); Fabian v. United States,127 F.Supp. 726 (D. Conn. 1954). For example, this section did not apply where by deed of gift the decedent and his spouse transferred a farm to their four children and contemporaneously rented the farm from their children at its fair rental value. Estate of Barlow v. Commissioner,55 T.C. 666 (1971). Nor does the section apply where a husband transfers his interest in a residence to his wife and they continue to occupy it as the family home, unless, by agreement, he reserves the right of occupancy as an incident to the transfer. Union Planters National Bank v. United States,361 F.2d 662 (6th Cir. 1966); Estate of Binkley v. United States,358 F.2d 639 (3d Cir. 1966); Stephenson v. United States,238 F. Supp. 660 (W.D. Va. 1965); *451 Estate of Gutchess46 T.C. 554 (1966). The life interest retained by the decedent need not be created by the express terms of the instrument of transfer; nor need it be legally enforceable. Estate of McNichol v. Commissioner,29 T.C. 1179, 1183 (1958) affd. 265 F.2d 667 (3d Cir. 1959), cert. denied 361 U.S. 829 (1959). The existence of an agreement by which the possession or enjoyment of, or the right to income from, the property is retained may be inferred from the circumstances of the transfer and the manner in which the transferred property is used. Skinner's Estate v. United States,316 F.2d 517 (3d Cir. 1963). But such circumstances must show that such an agreement was made contemporaneously with the transfer. The parties are in agreement that the Broadway property was transferred to the trust for less than full consideration. However, the parties disagree on whether Giselman retained an interest in the property so as to require that the fair market value of the Broadway property be included *452 in his taxable estate. Under the terms of the trust instrument the trustees were given the authority and power to take possession of, manage and control said property, collect all income therefrom, and to pay all taxes and expenses necessary for the preservation of said property and for the protection of the interests of the beneficiaries of the trust. The trustees could invest any funds received from capital or principal of the trust. Upon termination of the trust the trustees were to "close the trusteeship" and disburse the property thereof to the beneficiaries. The trust was made irrevocable and should "in no wise be construed as leaving a possibility of a reverter to the donors or either of them." Upon termination of the trust the trustees were directed to convey any real property to the legal heirs of any deceased beneficiary. There can be no question that under the terms of the trust agreement Joseph Giselman irrevocably transferred all his interest in the Broadway property to the trust and retained no interest in it except the right to rent it. Respondent alleges that a life interest was retained by Giselman pursuant to an understanding or agreement which was either *453 expressed or implied. Respondent presented no evidence of an express agreement and therefore his determination can be upheld only if he has presented sufficient evidence to establish that an implied agreement in fact existed at the time of the transfer. Respondent asserts that the following facts establish the existence of an implied agreement: (1) rent was not paid for the property after the initial 16-month period of the trust, (2) less than fair rental value was paid for use of the property, (3) Giselman's children did not treat the property as business property on their individual Federal income tax returns, and (4) Harry Giselman said he would not evict his father. After consideration of all the facts and circumstances, we find that respondent failed to establish the existence of an implied agreement whereby Giselman retained a life estate in the Broadway property at the time he transferred the property into the trust. Respondent failed to establish that the $ 200 per month payments called for in the trust agreement, and in fact made for the 16 month period from September 1955 through and including December 1956, were less than the fair market rental value of the property *454 at that time. Respondent needed to prove that an implied agreement existed at the time of transfer. It is possible that the family agreed at the time of transfer to require Giselman to pay fair rental value for the Broadway property for the first 16 months and thereafter to allow him to use the property without additional rent payments. However, respondent has not proven this. It is also possible that Giselman and his children reached an agreement sometime after the transfer that he would be allowed to use the property for less than fair market value; however, the facts are also insufficient to establish this. Under these facts, we need not address whether continued payment of tax and insurance on the Broadway property from 1957 to 1965 constituted fair market value of the property. [15]
*455 Respondent's concern that the children did not report income from the Broadway property on their individual Federal income tax returns is irrelevant to this case. [16]
Harry Giselman did not state that he would not evict his father from the Broadway property, but that "I don't know if you could throw him out. I don't know if that actually came up, you know." The fact that Harry Giselman did not recall discussing eviction with his father does not establish an implied agreement to use the property for less than fair rental value. Respondent failed to prove that Giselman retained a life estate, or any other interest, in the Broadway property that would meet the requirements of section 2036(a)(1) or (2). Accordingly, the value of the Broadway property is not included in decedent's taxable estate. Decision will be entered under Rule 155.
APPENDIX "A"
J. W. GISELMAN, CORP.
STATEMENT OF INCOME AND EXPENSES 1975-1979
Year Ended December 31
1979
1978
1977
Sales
1,604,721
1,404,927
1,331,552
Cost of Goods Sold
1,252,809
1,076,263
1,063,785
Gross Profit
351,912
328,664
267,767
Operating Expenses
Officers' Compensation   60,175
42,905
33,093
Salaries and Wages   18,970
15,687
9,150
Repairs   4,257
2,262
2,972
Bad Debts   2,823
0
0
Rents   0
0
0
Payroll and other taxes   84,318
78,574
73,040
Property tax   1,611
2,304
2,750
Interest Expense   124
6,139
7,563
Contributions   265
Advertising   1,401
1,783
369
Employee Benefits   76,551
53,173
48,068
Discounts Allowed   183
55
492
Sample Expense   0
431
58
Salary & Printing   4,312
5,325
3,067
Insurance   15,494
9,093
6,832
Commissions   2,198
531
616
Professional Fees   2,928
1,779
9,760
Dues and Subscriptions   1,077
1,063
747
Telephone   5,742
5,365
3,900
Miscellaneous Expenses   138
0
0
Travel Expenses   0
5,467
1,328
Conversion Loss   0
0
0
Total Operating Expenses
282,567
231,936
203,805
Other Income (Expense)
Interest   3,959
2,000
320
Misc. Other Income   0
265
0
Gross Rents   0
0
0
Gain (Loss) from Sale of Assets   0
0
0
Total Other Income (Expense)
3,959
2,265
320
Net Income Before Taxes
73,304
98,993
64,282
Provision for Taxes
19,897
10,186
13,020
Net Income
53,407
88,807
51,262
*456 APPENDIX "A"
J. W. GISELMAN, CORP.
STATEMENT OF INCOME AND EXPENSES 1975-1979
Year Ended December 31
1976
1975
Sales
948,529
752,331
Cost of Goods Sold
774,039
611,043
Gross Profit
174,490
141,288
Operating Expenses
Officers' Compensation   34,292
28,500
Salaries and Wages   0
7,089
Repairs   1,597
677
Bad Debts   4,743
3,775
Rents   0
0
Payroll and other taxes   37,180
26,214
Property tax   3,946
3,714
Interest Expense   18,250
9,775
Contributions   0
Advertising   1,143
312
Employee Benefits   29,270
21,188
Discounts Allowed   675
1,707
Sample Expense   1,032
617
Salary & Printing   3,247
1,276
Insurance   4,374
3,369
Commissions   900
291
Professional Fees   3,961
9,015
Dues and Subscriptions   1,331
825
Telephone   4,383
4,102
Miscellaneous Expenses   475
0
Travel Expenses   0
0
Conversion Loss   0
0
Total Operating Expenses
150,799
122,446
Other Income (Expense)
Interest   6
285
Misc. Other Income   0
0
Gross Rents   1,867
2,190
Gain (Loss) from Sale of Assets   0
(174
Total Other Income (Expense)
1,873
2,301
Net Income Before Taxes
25,564
21,143
Provision for Taxes
10
10
Net Income
25,554
21,143
*457 APPENDIX "B"
STATEMENT OF INCOME AND EXPENSES - 9 mos. 1980
INCOME FROM SALES:
Sales     $ 936,109.80
Less, Returns & Allowances        6,239.29
NET SALES                    $ 929,870.51
COST OF GOODS SOLD:
Purchases     273,205.21
Inventory Dec. 31, 1979     148,947.65
422,152.86
Inventory Sept. 30, 1980     57,161.81
364,991.05
GROSS PROFIT ON SALES                    564,879.46
OPERATING EXPENSES:
Interest Expense     7,867.54
Discounts Allowed     125.34
Equipment Rental     1,245.24
Sample Expense     590.08
Labor     365,159.75
Operating Supplies     210.64
Stationary & Printing     1,620.94
State Accident Industrial Fund     13,637.21
Social Security     22,380.34
Oregon Unemployment     8,134.63
Federal Unemployment     1,280.71
Washington Excise Tax     2.71
Carpenters Industrial Fund     681.12
Carpenters Health & Welfare     37,455.75
Carpenters Vacation     13,380.59
Floor Covering Health & Welfare (carpet)     10,599.83
Floor Covering Vacation     3,524.43
Teamsters Health & Welfare     1,665.04
Depreciation     1,249.80
Insurance     7,416.97
Auto Expense     19,415.22
Freight     12,468.99
Real Estate Taxes     876.43
Audit & Legal     3,867.20
Advertising     350.81
Repairs & Maintenance     738.20
Dues & Subscriptions     1,119.00
Office Expense     340.53
Donations     135.00
Misc. Expense     1,306.70
Warehouse Expense     1,248.75
Heat & Power     3,077.30
Travel     1,166.17
Sub-Contracts     452.50
Telephone Expense     3,588.44
Bonds - Licenses     324.22
Tri-Met Tax     2,042.53
Total Operating Expenses                    550,746.65
14,132.81
OTHER INCOME:     25,680.41
NET INCOME:                    39,812.22
*458 >100> >101> APPENDIX "C"
J. W. GISELMAN, CORP.
BALANCE SHEET 1975-1979
as of December 31
9 Mos.
1979
1978
9-30-80
ASSETS
Current Assets
Cash   40,841 5,553 7,926 Trade Notes and Accts. Rec.   180,821 196,439 191,123 less allowance for bad debts   (9,672)
(9,672)
(11,387)
Trade Notes & Accts. Rec.-net   171,149 186,767 179,736 Inventories   57,162 55,399 52,123 Prepaid Interest   0 0 0 Tax Reserves   0 0 0 Interest Receivable   910 0 2,000 Notes Receivable   0 0 0 Total Current Assets      270,062 247,719 241,785 Land
15,198 24,193 20,435 Fixed Assets
41,486 43,108 39,446 less accumulated depreciation
(31,397)
(30,797)
(28,166)
Net Fixed Assets   10,089 12,311 11,280 Loans to Stockholders
9,367 10,423 1,385 Mortgage & Real Estate Loans
54,447 50,488 55,600 Land and Building
0 0 0 Total Assets
359,163 345,134 330,485 LIABILITIES AND STOCKHOLDERS' EQUITY
Current Liabilities
Accounts Payable   30,822 31,838 48,863 Notes Payable   0 4,000 13,757 Property Taxes   2,980 5,923 5,958 Payroll Taxes   11,439 7,650 17,641 Accrued Expenses   1,161 2,649 11,635 Accrued Income Taxes   0 13,629 6,194 Accrued Payroll   0 6,500 4,300 Total Current Liabilities      46,402 72,189 108,348 Long Term Debt
0 0 0 Land & Building Mortgage
0 0 0 Equity
Preferred Stock   100 100 100 Common Stock   100,000 100,000 100,000 Paid in Capital   0 0 0 Retained Earnings   212,660 172,845 122,037 Total Equity      312,760 272,945 222,137 Total Liabilities and Stockholders'
Equity
359,163 345,134 330,485 *459 APPENDIX "C"
J. W. GISELMAN, CORP.
BALANCE SHEET 1975-1979
as of December 31
1977
1976
1975
ASSETS
Current Assets
Cash   3,112 10,594 968 Trade Notes and Accts. Rec.   159,207 126,390 110,216 less allowance for bad debts   (11,952)
(11,103)
(7,672)
Trade Notes & Accts. Rec.-net   147,255 115,287 102,544 Inventories   56,470 30,692 27,438 Prepaid Interest   69 482 860 Tax Reserves   0 0 675 Interest Receivable   0 0 0 Notes Receivable   0 0 0 Total Current Assets      206,906 157,055 132,485 Land
33,456 17,415 17,415 Fixed Assets
38,249 43,212 40,429 less accumulated depreciation
(25,980)
(25,227)
(23,328)
Net Fixed Assets   12,269 17,985 17,101 Loans to Stockholders
35,903 21,527 10,770 Mortgage & Real Estate Loans
6,131 7,000 0 Land and Building
0 0 69,400 Total Assets
294,665 220,982 247,171 LIABILITIES AND STOCKHOLDERS' EQUITY
Current Liabilities
Accounts Payable   85,087 65,066 75,083 Notes Payable   34,825 48,544 56,849 Property Taxes   6,879 7,024 5,896 Payroll Taxes   15,165 6,349 7,788 Accrued Expenses   13,606 11,129 7,141 Accrued Income Taxes   13,020 0 0 Accrued Payroll   0 0 0 Total Current Liabilities      168,582 138,112 152,757 Long Term Debt
1,232 3,008 2,312 Land & Building Mortgage
0 0 23,101 Equity
Preferred Stock   100 0 0 Common Stock   100,000 100,000 100,000 Paid in Capital   0 0 0 Retained Earnings   24,751 (20,138)
(30,999)
Total Equity      124,851 79,662 69,001 Total Liabilities and Stockholders'
Equity
294,665 220,982 247,171 *460 Footnotes
1. The parties are in agreement that a debt of the decedent in the amount of $ 9,141.49 not reported on the decedent's Federal estate tax return is deductible. ↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended, and in effect as of the date of the decedent's death. All Rule references are to the Tax Court Rules of Practice and Procedure. ↩
3. Giselman may have asked others to help prepare some estimates. However, all estimates were either prepared, or reviewed and approved, personally by Giselman. ↩
4. The Oregon excise tax liability is included in the category "provision for taxes." ↩
5. The chart does not reflect receipt of $ 16,600 insurance recovery received by the corporation in 1980. ↩
6. The corporation was in fact liquidated subsequent to the date of Gilbert's appraisal report. ↩
7. In some of the calculations contained in his written appraisal report, Gilbert included the corporation's financial data for the interim year ended September 30, 1980. However, when the September 1980 figures were used, Gilbert also repeated the calculations excluding the 1980 data. He started in his report that "this interim period should be considered to be non-normal because of fairly large bad debts that were not reflected in the income statement until year end." ↩
8. Clausen did not believe the financial data provided by the September 30, 1980 statements to be reliable and did not incorporate this data into his findings. Speaking of the interim statements he concluded, "An appraiser would be ill-advised to conclude the value of an enterprise based upon interim profits, which are distorted by seasonal trends, which cannot be compared to prior-year interim results, and on which the preparer is not held accountable for its accuracy." ↩
9. Respondent urges the Court to make these two, and other, modifications to Gilbert's findings. We have considered all of respondent's proposed adjustments. However, we find that only the two adjustments discussed herein are sufficiently supported by the evidence to require modification of Gilbert's findings. ↩
10. Both experts used the fair market value of the Broadway property in determining the fair rental value. ↩
11. Clausen likewise failed to use the stipulated value of the property in his determination of the imputed fair market rental of the Broadway property. Clausen used a $ 120,000 figure. Presumably both experts calculated the imputed fair market rental before the parties had entered into the Stipulation of Facts. ↩
12. We have given no consideration in valuing the stock of the Giselman company, to the evidence offered by petitioner and objected to by respondent that the Giselman II company lost money in each of the five years following Giselman's death. These figures would not have been available to a prospective purchaser at the valuation date. Nevertheless, they do lend support to petitioner's contention that Giselman was the key person in the organization and that a prospective purchaser would take into consideration, as a negative factor, the fact that he would no longer be available. They also lend support to Gilbert's determination that the Giselman corporation was in a cyclical rather than a growth business and that the year 1979 was the top of the cycle. It is also interesting to note that while, as respondent points out, the gross profit of the Giselman company increased about 2-1/2 times between 1975 to 1977, the net income of the business for 1979 was considerably less than its net income for 1978. ↩
13. Gilbert originally determined the value to be approximately $ 49,000 in his report. However, at trial he conceded that he made an error and that the correct figure should be approximately $ 55,000. ↩
14. Sec. 2036. Transfers with retained life estate. (a) General Rule. - The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in the case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which in fact does not end before his death - (1) the possession or enjoyment of, or the right to the income from, the property, or (2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom. ↩
15. Respondent asserts that payment of taxes and insurance only without additional payment for the usage of the Broadway property does not constitute a fair rental value of the property. Petitioner, however, asserts that payment of taxes and insurance on the Broadway property during the years in issue did represent a fair rental value because of the building's advanced state of disrepair. ↩
16. Even if relevant, respondent has not established this fact. ↩