HERIBERTO A. FERRARI AND NOEMI O. FERRARI, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ferrari v. Commissioner
Docket No. 36048-87
United States Tax Court
T.C. Memo 1989-521; 1989 Tax Ct. Memo LEXIS 521; 58 T.C.M. (CCH) 221; T.C.M. (RIA) 89521; September 25, 1989; As corrected September 26, 1989 *521 Held: Values of pre-Columbian art objects redetermined for charitable contribution purposes. Carl Wells Hall, III, for the petitioners. Frank C. McClanahan, III, for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: By statutory notice dated August 7, 1987, respondent determined deficiencies in the income tax liability of petitioners for the years 1978 through 1981, both inclusive, in the following amounts: $ 63,451, $ 24,093, $ 34,237, and $ 18,953. The deficiencies result from the disallowance by respondent of portions of deductions for charitable contributions made in each of these years. The issue is the value of pre-Columbian art objects donated to Duke University Museum *522 of Art in the years 1978, 1979, and 1980 and to The Mint Museum of Art in 1981. [1]
FINDINGS OF FACT At the time the petition in this case was filed, petitioners, who are husband and wife, resided in Charlotte, North Carolina. The parties have stipulated that the donations of pre-Columbian art consisted of 21 pieces and that "for purposes of convenience" the parties have referred to these 21 items in this record by "museum collection number." That number has also been used as a method of identification in the appraisal reports. The parties have not, however, stipulated specifically as to which pieces were donated in which of the 4 calendar years. Petitioners' tax returns for the 4 years contain detailed descriptions of the art items donated. In addition, the museum collection numbers used in the appraisal reports commence with two digits followed by a period and further numbers. The first two digits are respectively, *523 "78," "79," "80," and "81." We therefore assume for purposes of this case that these first two digits refer to the last two digits of the respective years during which the particular donations were made, i.e., that the museum collection number 81.214.1 describes a piece of art donated by petitioners during the year 1981. The parties have further stipulated that the two donee institutions are qualified institutions for the purposes of charitable contribution deductions under section 170(c)[2] and that in fact these 21 pieces of pre-Columbian art were contributed in the years in which the deductions were claimed. The two expert witnesses who testified during the trial, Mr. Ronald W. Dammann for petitioners and Ms. Claudia Giangola for respondent, have agreed on the valuations of two of the items, numbers 79.10.4 and 79.10.6, each with a value of $ 3,000. The parties have further accepted the qualifications of each of the two experts. Thus, the sole issue before the Court is the value of the other 19 items of donated art. *524 The Expert Witnesses
Petitioners' expert, Mr. Dammann, has been employed by the Stendahl Galleries in Hollywood, California, for 16 years in the capacity of buying, selling, authenticating, appraising, and restoring pre-Columbian and similar art. He is a member of the International Society of Appraisers and a senior member of the American Society of Appraisers specializing in pre-Columbian art. He has also testified before this Court with respect to pre-Columbian art in one other case -- Biagiotti v. Commissioner, T.C. Memo. 1986-460. We take judicial notice of further details as to his qualifications which appear in our opinion in that case. Mr. Dammann's credentials are impressive. We find him to be both a credible witness and one well qualified to value the art items in dispute. Respondent's expert, Ms. Giangola, graduated from college in 1966 where she majored in studio painting and art history. From September 1966 to August 1983 she was employed by Sotheby Parke Bernet (Sotheby) auction gallery in New York City. She was responsible for starting a pre-Columbian department for Sotheby. In that job she solicited items for sale at auction and appraised *525 pre-Columbian art for auction purposes and also for insurance and probate purposes. From September 1983 to the present Ms. Giangola has been co-owner of Ancient Art of the New World, Inc., a New York City art gallery specializing in pre-Columbian art. Ms. Giangola is not a member of the American Society of Appraisers and apparently has not appeared as a witness in any other case before this Court. She has been a member of respondent's Art Advisory Panel since July 1988. Although she has not been active in the pre-Columbian art field as long as Mr. Dammann, she too impressed the Court as being a credible and competent expert in pre-Columbian art. The differences between the credentials of the two experts are not significant except for the far greater practical experience of Mr. Dammann in selling and, thus, valuing pre-Columbian art. Pre-Columbian Art
Pre-Columbian art by definition includes art objects made by civilizations in Mexico and Central and South America prior to the conquest of those areas by the Spanish in the 16th Century. Each piece of pre-Columbian art is unique. Many pieces if not most, of pre-Columbian art comparable to that involved in this case, and *526 including the 21 pieces before the Court, are found in a damaged condition. It is apparently the practice of dealers or wholesalers to cause missing pieces to be manufactured and painted in order to match the original portions of the particular item. In some instances the painting on the original portion is also renewed. This type of restoration has an impact on value in that within certain broad limits the greater the restoration, the lower the value of the particular artifact. Moreover, at some point, excessive restoration takes a piece of this art out of the category of an original and turns it into a reproduction. For example, it would certainly be misleading to sell as pre-Columbian art an object which consists of less than 25 percent original material. That dividing line may in fact be too low without a full disclosure to the customer. Value is determined by the condition, the uniqueness or rarity of the item, authenticity and size, and the market value of comparable objects. The age of a pre-Columbian art object can be determined by its style as well as by a process called thermal illuminescence. Because each piece of pre-Columbian art is unique and pricing is far *527 from an exact science, the actual value of any particular piece of this art will be somewhere within a range of values. We find generally that the lower end of the value range will be approximately 20 percent lower than the high end of the range. The market for pre-Columbian art which should be used for determination of value is the retail sales market at art galleries such as the Stendahl Galleries and the Ancient Art of the New World, Inc. Auction sales do not reflect the correct market. See Biagiotti v. Commissioner, supra. However, art gallery prices are neither published nor in most cases shown on price tags affixed to the object. Sale prices must be obtained directly from a person acting as a salesperson. Finally, there generally is some flexibility in pricing which permits some negotiating between the customer and the gallery. ULTIMATE FINDINGS OF FACT We find that the value of each of the 21 art objects listed below by their museum collection number is the dollar amount set forth opposite each such item: Museum Number
Value
78.41.1 $ 27,500
78.41.2 15,000
79.10.1 200
79.10.2 8,000
79.10.3 10,000
79.10.4 3,000
79.10.5 8,500
79.10.6 3,000
79.10.7 2,750
79.10.8 6,750
79.10.9 3,250
80.38.1 7,000
80.38.2 5,250
80.38.3 7,000
80.38.4 7,500
80.38.5 6,500
80.38.6 4,500
80.38.7 7,500
81.214.1
3,750
81.214.2
5,000
81.214.3
2,750
*528 OPINION This case presents another instance where this Court is called upon to value a relatively obscure collection of art objects on the basis of testimony by well-qualified individuals who unfortunately were able to arrive at a common valuation of only 2 out of the 21 objects. The Court is called upon to exercise its judgment in an area totally foreign to the training and experience of a trial judge. This is a particularly apt example of a valuation controversy where arbitration by a third expert in pre-Columbian art would have been a far more satisfactory method of arriving at valuation for tax purposes. We note that both appraisers originally valued each object at what that individual thought was the higher end of the valuation range. At the Court's request, Mr. Dammann provided in his testimony values which reflected his judgment of the middle of the range. Ms. Giangola testified that the range, in her judgment, was 15 to 20 percent of the high end value. Mr. Dammann, on the other hand, seemed to conclude that the range of values was almost infinite. Ms. Giangola's testimony on this point was much more credible and we have accepted it. That has not, however, solved *529 our problem because in most instances Mr. Dammann's median value differed from Ms. Giangola's high value by more than 20 percent. Petitioners seem to argue that this Court must accept the valuations of one or the other of the two expert witnesses who testified in this case, that only in special circumstances can a court substitute its judgment for that of an expert. For this position petitioners rely on Cullers v. Commissioner, 237 F.2d 611 (8th Cir. 1956), and Loesch & Green Construction Co. v. Commissioner, 211 F.2d 210 (6th Cir. 1954). However, the facts of these two cases make them inapt. In each case, the appellate court held that there was no evidence supporting this Court's valuations, the expert testimony of the taxpayer's experts was unimpeached, and there was no other expert testimony in the record. Neither case supports petitioners' argument. The law applicable to expert testimony was recently summarized by this Court in Estate of Giselman v. Commissioner, T.C. Memo. 1988-391, 55 T.C.M. 1654, 1658, 57 P-H Memo T.C. par. 88,391, 88-1932, 88-1937 from which we quote: Opinion evidence is admissible on the question *530 of value; however, it must be weighed in light of the demonstrated qualifications of the expert and all other evidence of value. * * * We are not bound by the opinion of any expert witness when that opinion is contrary to our own judgment. * * * We may embrace or reject expert testimony, whichever, in our best judgment, is appropriate. * * * We are not restricted to choose one valuation over the other, but may extract relevant findings from each in drawing our conclusions. * * * [Citations omitted.] We have embraced such portions of the testimony of each of the experts as we found to be proper. Our valuations are based on the entire record and reflect our own best judgment. Fair market value is for purposes of a charitable contribution deduction: the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having a reasonable knowledge of relevant facts. [Sec. 1.170A-1(c)(2), Income Tax Regulations.] Petitioners argue that fair market value is the highest price at which an object would change hands between a willing seller and a willing buyer. Petitioners cite no authority *531 for their proposition and we have found none. Moreover, the argument really misses the mark. The market in this case is the retail sales market at art galleries dealing in pre-Columbian art. Value is the price a customer would pay the gallery for a piece of this type of art. Comparable retail sales at galleries are the most significant criterion of fair market value. The range of prices arises out of the fact that, as both expert witnesses agreed, galleries have no way of uniformly fixing the price for items which are comparable. Pricing of a pre-Columbian art object is essentially a question of judgment and experience and is a product in part of the price paid by the gallery and its level of markup. The ranges which the experts describe cover, in their judgment, the range of prices among various art galleries which handle pre-Columbian items. Every price in that range should reflect at least in theory the price which might be realized by an art gallery in a sale of a comparable item to a retail customer. Thus, again in theory, the entire range reflects retail sale prices. Thus, fair market value as defined by the regulations is on this record not a single price but a range *532 of prices. Charitable contributions must be valued as of the date of the gift. Sec. 1.170A-1(c)(1), Income Tax Regs. Prices of pre-Columbian art change relatively slowly. The parties have assumed, as we do, that there were no significant price changes during the period 1978-1981. No issue is made that either expert was looking at the wrong period of time. Although petitioners argue that the fact that Mr. Dammann's appraisal was made in 1984, rather than in anticipation of trial, makes it more reliable, the authority relied upon for this proposition does not support it. In fact, in this case the 1984 date of Mr. Dammann's appraisal weighs against him since his recollection was not sufficiently fresh to permit him to answer some questions. Reference to one of the items involved reflects the problem faced by this Court. Number 79.10.8 is a carved bowl with circular glyph text and sides depicting two Cauac Monsters. Mr. Dammann's value at the high end of his range is $ 9,500, his median value is $ 7,500 and Ms. Giangola's value at the high end of her perceived range is $ 6,000. The high value assigned by respondent's expert is roughly 65 percent of the value of the high value *533 assigned by petitioners' expert and 80 percent of his median value. As we have already commented, it is astounding that these parties would seek a court solution to such a fact situation rather than arbitration by another expert. Ms. Giangola's appraisal contains a reasonably detailed description of each piece, including comments about the condition of each piece. None of her descriptions were questioned by petitioners. Ms. Giangola further described this collection as generally "lower quality material, material of the type which was in every day use rather than being specially made for wealthier and more important citizens." The record also reflects the fact that in July, 1988, in her capacity as a member of the Art Advisory Panel and together with other panel members, Ms. Giangola appraised these 21 pieces on the basis of photographs and other information. While her valuations reflect her own opinion, it is likely that her valuations are at least conservative and probably reflect discussions with other members of the Art Advisory Panel. Taking all of these factors into account, we have with three exceptions redetermined the fair market value of each piece in issue to be a *534 value which lies at the mid point between Mr. Dammann's mean or median value and Ms. Giangola's high value. We are confident that one could find a comparable piece of this art which in some gallery has sold at a value approximately equal to the value we have found. One exception to this approach to redetermining value is item 79.10.1 referred to by the experts as the Jaina figurine. Mr. Dammann's original valuation was $ 18,000 but he revised that figure downward to $ 500 during his initial testimony on the basis of a further examination of the figurine and his awareness that it was largely restored. Mr. Dammann described the figurine as having "been glued together with massive restoration." Ms. Giangola describes the figurine as a fake with a value of $ 200. We interpret this testimony of the experts to mean that the piece has more than 75 percent restoration. The extent of restoration of this item would cause it to fall outside the definition of pre-Columbian art. Mr. Dammann's initial appraisal of this item was at best sloppy. He offered no explanation for his failure to recognize the Jaina figurine as so heavily restored when he first appraised it. We found Ms. Giangola's *535 valuation to be the more accurate. With respect to item 79.10.3, a polychrome flat bottom cylinder depicting two seated figures of God L wearing elaborate headdress, Mr. Dammann made no change in his original appraised value of $ 20,000 when he complied with the Court's request that he fix a median value. Neither did he testify that his original $ 20,000 valuation did not reflect the high end of the range which generally was used by him in his appraisal. For this reason we have leaned more heavily on Ms. Giangola's valuation of $ 10,000. Accordingly, we found the value of item 79.10.3 to be $ 10,000. Our redetermination of the value of one other item requires comment. Item 78.41.2 is a polychrome flat bottom cylinder, probably a vase, originally valued by Mr. Dammann at $ 30,000. It has plaster on the inside with extensive repainting. Mr. Dammann revised his high value down to a range of $ 15,000 to $ 20,000 and fixed his median value at $ 15,000. Ms. Giangola assigned a value of $ 15,000. We accordingly found the value to be $ 15,000. Decision will be entered under Rule 155. Footnotes
1. The percentage limitations contained in section 170 I.R.C. 1954↩ precluded petitioners from utilizing in full the reported value of the donated art as deductions in some years, resulting in carryovers to later years, but these adjustments are not in issue.
2. Unless otherwise noted, all section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩