FRED JACOBSON AND DOROTHY G. JACOBSON, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Jacobson v. Commissioner
Docket Nos. 23446-83, 23447-83, 23448-83, 23449-83, 23450-83, 37688-85
United States Tax Court
T.C. Memo 1989-606; 1989 Tax Ct. Memo LEXIS 606; 58 T.C.M. (CCH) 645; T.C.M. (RIA) 89606; November 6, 1989
Allen J. Gordon, for the petitioners. Richard F. Stein, for the respondent. HAMBLEN
MEMORANDUM FINDINGS OF FACT AND OPINION HAMBLEN, Judge: Respondent determined the following deficiencies *607 and additions to petitioners' Federal income taxes: Petitioners
Year
Deficiency
Additions to Tax
Fred & Dorothy G.
1978
$ 211.86   -0-       Jacobson 1979
18,521.20
-0-       1980
3,165.00
-0-       Tavia F. & Freda
1979
36,064.00
-0-       H. Gordon 1980
27,656.00
-0-       James A., Jr. &
1979
12,876.00
-0-       Gwendolyn Murphy 1980
9,359.00
-0-       Milton E. & Susan
[2] 1979
1,112.00
-0-       J. Wilkins Daniel & Janet P.
1979
23,900.00
-0-       Gordon 1980
25,345.00
-0-       Allen J. & Barbara
1981
2,735.00
[3] Sec. 6621(c)
S. Gordon 1982
98,677.00
Sec. 6621(c)
After concessions by both parties, [4] the sole remaining issue for decision is the fair market value of a 13.88-acre parcel of land contributed *608 by petitioners to the Christian Broadcasting Network. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. *609 The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners Fred and Dorothy Jacobson, husband and wife; James A., Jr., and Gwendolyn Murphy, husband and wife; and Milton E. and Susan J. Wilkins, husband and wife, resided in Virginia Beach, Virginia, at the time of filing of their respective petitions in this case. Petitioners Tavia F. and Freda H. Gordon, husband and wife, and Daniel and Janet P. Gordon, husband and wife, resided in Norfolk, Virginia, at the time of filing of their respective petitions in this case. Petitioners Allen J. and Barbara S. Gordon, husband and wife, resided in Chesapeake, Virginia, at the time of filing their petition in this case. Each couple filed joint Federal income tax returns with the Internal Revenue Service Center at Memphis, Tennessee, for the respective taxable years in issue. Petitioners donated a parcel of property to the Christian Broadcasting Network (hereinafter "CBN") in July of 1978. The Deed of Gift, dated May 10, 1978, conveyed 13.88 acres of land located in the Kempsville Borough of Virginia Beach, Virginia (hereinafter "the City"). The property site is level, at street grade, with *610 no apparent topographical problems. At the time of the donation, the property was zoned for residential development and was served by the following utilities: electricity, telephone, 16-inch water line, 42-inch Hampton Roads force main sewer, and 8-inch gravity sewer. The donated property is situated on the south side of Indian River Road, 1200 feet east of Interstate 64 (hereinafter "I-64"). A main traffic artery between Norfolk and Virginia Beach, I-64 interchanges only with Indian River Road within the City. Kempsville Road intersects Indian River Road approximately two miles east of the donated property. Indian River Road was a two-lane highway at the time of the gift. The City Planning Commission (hereinafter "Commission") had scheduled to widen Indian River Road in 1980 and Kempsville Road in 1979 due to traffic demands. Kempsville was the fastest-growing borough of the City. At the time of the gift, land on the south side of Indian River Road between the donated property and Kempsville Road was improved with single family residences. No residential development occurred on Indian River Road in the five years prior to the gift. The International Headquarters of CBN *611 was adjacent to the west side of the donated property. In 1977, the City negotiated to purchase from petitioners a 100-foot wide easement across the donated property for $ 72,420. The easement consisted of 1.992 acres and was acquired for the purpose of building a drainage canal. Petitioners permitted construction of the canal to begin in 1977, but did not execute a deed of easement until December of 1979 and were not paid by the City until November of 1980. Petitioners' experts, Alexander M. Salzberg (hereinafter "Salzberg") and Anne P. Thompson, jointly prepared an appraisal of the property. At the time of the appraisal, Salzberg had been accepted as an expert witness for real estate valuations in Virginia Beach and surrounding cities. Salzberg was familiar with the Indian River Road corridor, having been a principal in several transactions in the area. Respondent's experts, Alexander P. Grice, III and Alexander P. Grice, IV also jointly prepared an appraisal report on the property. The elder Grice has been active in the real estate business since 1947 and has specialized in the appraisal of real property since 1953. The younger Grice was licensed as a real estate salesman *612 in 1978. Shortly after the gift, petitioners' experts opined that the fair market value of the property, as of July 9, 1978, was $ 750,000. On November 11, 1982, respondent's experts opined that, as of July 9, 1978, the fair market value of the property was $ 260,000. ULTIMATE FINDINGS OF FACT At the time of the donation, the fair market value of the donated land was $ 538,000. OPINION There is no dispute that petitioners' property donation to CBN is a charitable contribution under section 170(a)(1). The amount of the allowable deduction [5] is the fair market value of the property when donated, that is, "the price at which the property would change hands between a willing buyer and a willing seller." Sec. 1.170A-1(c)(2), Income Tax Regs.; Chiu v. Commissioner, 84 T.C. 722, 730 (1985). The parties disagree as to the property's fair market value based upon the appraisals of their respective "experts," and, consequently, we once again are called upon to resolve the matter by using our best judgment to determine what the "experts" cannot *613 agree on, namely, the fair market value of the property as of the time it was donated. The issue of fair market value is one of fact, and petitioners bear the burden of proving that respondent's determination is incorrect. Rule 142(a); Estate of Gilford v. Commissioner, 88 T.C. 38, 50-51 (1987). We are not bound by an expert opinion which is contrary to our judgment, Estate of Kreis v. Commissioner, 227 F.2d 753, 755 (6th Cir. 1955), affg. a Memorandum Opinion of this Court, and may either embrace or reject expert testimony whichever in our judgment is appropriate. Helvering v. National Grocery Co., 304 U.S. 282 (1938). We need not accept an expert's opinion in its entirety, and we may be selective in the use of any portion of such opinion. Parker v. Commissioner, 86 T.C. 547, 562 (1986). Again, we point out that we exercise our best judgment in determining a question of fact from *614 what is often inconsistent and incongruous rhetoric and opinion. The experts of each side of this dispute applied the direct sales approach, also known as the market approach, in valuing the property. In applying the direct sales approach, a study is made of the sales of properties which are deemed to be comparable to the property in question. The comparable sales are adjusted by differences, such as location, size, and sale date, to indicate a value range for the property being appraised. In the instant case, the two appraisals diverge substantially as to what properties were comparable to the donated property at the time of the gift. This divergence arises from the experts' differing conclusions as to the property's development potential and results in substantially differing opinions as to the property's fair market value. Petitioners' experts concluded, in their joint appraisal, that the donated property was suitable for commercial or light industrial development at the time of the donation. Salzberg believed the property to be situated in a highly desirable location, as Kempsville *615 was the fastest-growing borough of the City. He asserted that the substantial amount of traffic which passed in front of the donated property would support commercial development. The planned widening of Indian River and Kempsville Roads would result in a major intersection where the roads cross, he noted. Consequently, the traffic in front of the donated property would increase as vehicles traveled east on Indian River Road from I-64 to Kempsville Road. Salzberg further noted that I-64 is a major traffic artery connecting Norfolk to Virginia Beach and that it interchanges only with Indian River Road within the City. Salzberg observed that, at the time of the gift, investors were purchasing houses on Indian River Road for commercial development and that a 5.6-acre shopping center adjacent to the southwest corner of Indian River Road and Kempsville Road was in the final planning stages. We find both the commercial development and the fact that no residences were built on Indian River Road between I-64 and Kempsville Road in the five years prior to the gift, nor for the ten years between the gift and trial, significant as evidence of the area's commercial potential. Salzberg also *616 confirmed that extensive commercial development has taken place in the area since the property donation. Petitioners' experts noted that the property itself is well suited for commercial development. The property site is more or less level, at street grade, with no apparent topographical problems. At the time of the donation, the following utilities served the donated property: electricity, telephone, 16-inch water line, 42-inch Hampton Roads force main sewer, and 8-inch gravity sewer. William L. Rice supported Salzberg's appraisal. Rice was a real estate agent for the City, at the time of the gift, and was charged with acquiring lands for the City for road projects, sewer projects, and school sites. Rice believed the area "was developing fast", and he was aware of certain utilities that served the property at the time of the donation. In 1982, respondent's experts in their joint appraisal determined the donated property to be unsuitable for commercial or light industrial development at the time of the gift. Respondent's experts based their opinion, in part, on the fact that the property was zoned for residential development at the time of the gift. According to respondent's *617 experts, the Commission, which must approve all zoning changes, almost uniformly denied rezoning requests from residential to commercial along Indian River Road near the donated property. Respondent introduced letters from the Commission, dating from 1982, in which the Commission denied rezoning requests along Indian River Road. In the letters, the Commission cited Kempsville as the fastest growing area in the City, noted that the growth rate outpaced the road capacity, determined that commercial development would increase road traffic, and concluded that land use should be aimed at avoiding additional stress on the already overcrowded transportation system. The Commission also noted that Indian River Road was becoming one of the City's most traveled streets. We recognize that, by 1982, pressures from the growth in the Kempsville area had generated traffic problems and that the Commission may have pondered limiting rezoning to commercial. However, such contemplated zoning limitations, if any, do not relate to the time of the gift. The gift occurred approximately four years prior to the Commissioner's letters. Evidence in the record of this case indicates, and we find, that rezoning *618 of the donated property was possible and, under the circumstances then extant, even probable at the time of the gift. Salzberg in connection with his appraisal informally discussed the possibility of rezoning with the Commission. Based on that conversation, Salzberg believed it would be possible to have the property rezoned. We agree. Respondent's experts listed in their report two properties located on Indian River Road that were sold in 1977 and 1978. These properties were both successfully rezoned to commercial. Furthermore, CBN successfully rezoned the donated property to commercial in 1981. Facts relied upon in making a determination of fair market value must have been known or knowable as of the valuation date. Subsequent events or facts may be used to corroborate an appraisal that is based on facts known as of the valuation date. Estate of Spruill v. Commissioner, 88 T.C. 1197, 1233 (1987). Hindsight cannot, however, be the only evidence relied on, and we believe the facts existing at the time of donation which indicate a commercial use are corroborated by subsequent *619 developments. Respondent's experts concluded there was no demand for further commercial development in the Kempsville area at the time of the gift, noting vacancies in local shopping centers. The record in this case, however, supports the fact that Kempsville was in a period of strong commercial growth at the time of the gift. We observe that respondent's experts agreed in their appraisal that the Kempsville area was the fastest-growing borough of the City. Respondent's experts incorrectly determined certain information concerning the donated property. They suggest, in their appraisal, that the property is not served by a sewer. The testimony of Salzberg, Rice, and petitioner Milton E. Wilkins support the fact that there is a gravity sewer serving the donated property. Wilkins testified that he installed the sewer. Rice and Salzberg stated that the sewer existed and that it served the property. After evaluating all of the evidence and the opinions of the experts, we are persuaded that respondent's experts erred in their conclusion of the donated property's potential for development. In overview, respondent's experts ignored specific facts concerning the donated property, relied *620 heavily on evidence existing only after the date of donation, and reached conclusions that are unrealistic in view of all of the evidence. Accordingly, we find the donated property was suitable for commercial development at the time it was donated. In applying the direct sales approach to value, it is appropriate to consider the sales of property that are suitable for commercial development. [6]
Petitioners sold a 1.992-acre easement to the City for $ 72,420 in the year prior to the gift to CBN. The City purchased the easement for fair market value to construct a drainage canal. Respondent's assertions to the contrary belie his familiarity with negotiations and arrangements between property owners and governmental units with the power of eminent domain. Further, no evidence is in the record that the municipality involved paid more than fair market value for the property and we refuse to ascribe any such egregious conduct to that government. Consequently, we use this sale as a measure by which to evaluate the *621 appropriateness of the experts' comparables. Respondent's experts, in applying the direct sales approach, considered the donated property to be suitable for residential, not commercial, development. Many of the property sales that respondent's expert found comparable were located in residential areas or large distances from major thoroughfares and intersections. We find most of these property sales to be noncomparable. However, three of the property sales listed by respondent's experts are comparable to the donated property's location, physical attributes, and sale date. All three are located on Indian River Road in proximity to I-64 and were sold in 1977 or 1978. Two of these sales, though, were not sales which reflect fair market value. One property was sold pursuant to a foreclosure at $ 10,168 per acre, and the other was an apparent part-sale, part-gift to CBN at $ 15,945 per acre. Noting the fact that the City paid approximately $ 36,355 per acre for the easement, we find these two property sales to be noncomparable to the donated property. The third property was sold by Dairymen, Inc. for fair market value. The Dairymen property is located on Indian River Road to the *622 west of I-64. The property is 7.047 acres, and was successfully rezoned to commercial from residential after its sale in September of 1978. The Dairymen property was sold for $ 43,990 per acre, an amount which is consistent with the $ 36,355 cost of the easement. Respondent's experts acknowledge in their appraisal that the Dairymen property was the closest commercial comparable to the donated property in terms of sale date, location, and size. Petitioners' experts also found the Dairymen property to be comparable. Salzberg stated that the Dairymen property was developed in a manner similar to his proposed development of the donated property. Respondent's experts submitted additional comparable properties at trial. Those comparables indicate that the Dairymen property was sold for fair market value and support the sale of the Dairymen property as an appropriate comparable to the donated property. Petitioners' experts found the donated property's value to be $ 54,034 per acre, exceeding the value of the Dairymen property. We find their figure to be in excess of the donated property's fair market value. They included in their appraisal several property sales which support their *623 determination as to the donated property's value. However, these properties differ from the donated property with respect to size. The majority of these sales were of less than one acre. Respondent's experts note that smaller properties tend to sell for more per acre than larger properties. The sale prices of these comparables should have been adjusted to take into account the differences in acreage sold. In addition, in determining the donated property's value, petitioners' experts purported to take into account the cost of a road to provide access to rear portions of the property. However, they failed to take into account the full costs of such subdivision and development. Furthermore, the same opportunity for subdivision and development was available to the sellers of the Dairymen property. Accordingly, we find that the 13.88 acres of donated property, as unencumbered land, was worth $ 43,990 per acre at the time it was donated. Since the petitioners previously had sold an easement across the property for fair market value, the value of the property when donated must reflect that sale, reducing its value to $ 538,000. In closing, we once again observe with some dismay the *624 disparity in the reports of the experts in this case. We have previously remarked that we sense some degree of advocacy on one or both sides when such divergence of opinion as to value occurs in the reports of apparently qualified realtors-appraisers. Mathis v. Commissioner, T.C. Memo. 1989-254 (57 TCM 519, 527; 58 P-H Memo T.C. par. 89,254, 1239, 1246). If this is the case, the experts can be viewed only as hired guns of the side that retained them, and this not only disparages their professional status but precludes their assistance to the Court in reaching a proper and reasonably accurate conclusion. The consistent divergence of high value for one side and low for the other can only lead to the inference that one or the other or both appraisals are result oriented. Here, the discrepancy in value opined by the experts was close to a half million dollars. We recognize that valuation is anything but precise, but we think this is beyond reason for the small parcel in the particular area we are concerned with here and would suggest that perhaps the experts might do well to review their methods with this in mind. See, e.g., Laureys v. Commissioner, 92 T.C. 101, 122-129 (1989); *625 Buffalo Tool & Die Mfg. Co. v. Commissioner, 74 T.C. 441, 452 (1980); Ferrari v. Commissioner, T.C. Memo. 1989-521; and Mathis v. Commissioner, supra.
We have considered the other arguments of the parties and find them unpersuasive. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Tavia F. Gordon and Freda H. Gordon, docket No. 23447-83; James A. Murphy, Jr., and Gwendolyn Murphy, docket No. 23448-83; Milton E. Wilkins and Susan J. Wilkins, docket No. 23449-83; Daniel Gordon and Janet P. Gordon, docket No. 23450-83; Allen J. Gordon and Barbara S. Gordon, docket No. 37688-85.↩
2. The parties stipulated that the Wilkins' 1978 taxable year was not in issue. ↩
3. Unless otherwise indicated, section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue and rule references are to the Tax Court Rules of Practice and Procedure.↩
4. Petitioners Allen J. and Barbara S. Gordon conceded that they erroneously claimed, on their 1982 joint return, a capital loss in the amount of $ 18,436 for the condemnation of certain property. In fact, they had realized a gain in the amount of $ 18,436, which they elected to reinvest in other property. They also conceded that, on the same return, they improperly reported the sale of two lots in the Hudgins Shores subdivision as ordinary loss on Schedule C. The loss should have been reported on Schedule D. They sold the lots for a total of $ 224,000 and incurred the following expenses with respect to the two lots: (1) land costs of $ 55,000, (2) construction costs of $ 179,940, and (3) selling costs of $ 10,825. Allen J. and Barbara S. Gordon further conceded that, on their 1982 joint return, they improperly claimed a $ 300,000 nonbusiness bad debt and improperly included in gross income $ 225,000 as payments received on an installment sale of a five-acre parcel of land. Petitioners received only $ 50,000 on the installment note in 1982.↩
5. The 30 percent maximum percentage limitation on deductions for charitable contributions under sec. 170(b)(1)↩ applies in this case.
6. We considered the property's 1978-1979 assessed value for real estate tax purposes, but found the value not to represent the property's fair market value.↩