ESTATE OF RICHARD J. HATCHETT, DECEASED, DAVID W. HATCHETT, EXECUTOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Hatchett v. Commissioner
Docket No. 28582-85
United States Tax Court
T.C. Memo 1989-637; 1989 Tax Ct. Memo LEXIS 637; 58 T.C.M. (CCH) 801; T.C.M. (RIA) 89637; November 29, 1989
Lauch M. Magruder, Jr. and Jack D. Warren, for the petitioner. John F. Driscoll, for the respondent. HAMBLEN
MEMORANDUM FINDINGS OF FACT AND OPINION HAMBLEN, Judge: Respondent determined a deficiency of $ 84,445 in the Federal estate tax liability of the estate of Richard *639 J. Hatchett. The issues to be decided are 1) the fair market value of decedent's residence; 2) the fair market value of decedent's farm land; 3) whether petitioner has established its entitlement under section 2040(a)[1] to exclude $ 49,725 from decedent's gross estate; and 4) whether the property interest passing to decedent's surviving spouse under his will is exercisable by her in all events. FINDINGS OF FACT In General
Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. Decedent, Richard J. Hatchett, died a resident of Yazoo County, Mississippi, on October 10, 1981. On April 18, 1982, David W. Hatchett, decedent's grandson, was qualified as executor of decedent's estate by the Chancery Court of Yazoo County, Mississippi. At the time of the filing of the petition in this case, David W. Hatchett resided in Jackson, Mississippi. *640 On September 15, 1982, David W. Hatchett filed decedent's Federal estate tax return. Decedent's reported gross estate included four parcels of farmland located in Yazoo County, Mississippi, valued in Schedule A at $ 113,350, decedent's residence located in Holly Bluff, Mississippi, valued in Schedule A at $ 76,000, and $ 49,726 worth of property reported in Schedule E to have been jointly owned by decedent and his surviving spouse. The claimed deductions included a marital deduction of $ 177,723. Fair Market Value of Decedent's Residence
Holly Bluff, Mississippi, a small unincorporated farming community, has a population of approximately 200 to 400 people, and has about 30 houses, four general stores, and a service station. Holly Bluff has a water system but no hospital, fire department, police department, or sewage system. Holly Bluff has a low elevation and in 1973 was flooded to such an extent that a motor boat could be driven down the main street. After the 1973 flood, people began moving out of the Holly Bluff area. Holly Bluff's economy declined between 1982 and 1986. Most of the homes in Holly Bluff have values between $ 10,000 and $ 15,000 and serve as residences *641 for tenant farmers. Holly Bluff is approximately 25 to 30 miles from Yazoo City, Mississippi. Yazoo City, a town of approximately 12,000 to 13,000 people, is the county seat of Yazoo County and is the center of shopping and employment for Yazoo County. In December 1981, Theressa Hatchett, decedent's surviving spouse, moved out of the Holly Bluff residence in which she and decedent had previously resided. The Holly Bluff residence was built in October 1957, and there has been no major remodeling of the house since that time. The Holly Bluff residence was initially offered for sale to M. S. "Buddy" Hatchett, who indicated that he was not interested in purchasing the residence. When David Hatchett offered decedent's residence to Buddy Hatchett, they did not discuss a purchase price. Buddy Hatchett was reluctant to purchase decedent's residence because he already owned a residence just nine miles away from Holly Bluff. Buddy Hatchett preferred the country setting of his own residence over the small town setting of Holly Bluff. The offer to sell decedent's residence to Buddy Hatchett was made within one year of decedent's date of death. David Hatchett and Buddy Hatchett informed *642 everyone in Holly Bluff that the house was available for sale. David Hatchett made no attempt to sell the residence through a broker because there were no realtors in Holly Bluff and David Hatchett was unaware that any broker had ever sold a house in Holly Bluff. After a period of time in which no potential buyer stepped forward, Oscar Goodman expressed an interest in purchasing the residence and, after from two to two and one-half years of negotiations, purchased the residence in May of 1986 for $ 52,000. In valuing decedent's Holly Bluff residence at $ 76,000 on decedent's estate tax return, David Hatchett relied on an appraisal by Reba Pepper, a real estate appraiser from Russell City, Mississippi. Ms. Pepper, who has held a real estate broker's license in Mississippi since 1980, serves as a real estate appraiser for all of Yazoo County and the Mississippi Delta area in general. Ms. Pepper prepared the real estate yappraisal of decedent's residence attached to decedent's estate tax return. Ms. Pepper performed her appraisal of decedent's residence for David Hatchett on June 14, 1982. In appraising the Holly Bluff residence, Ms. Pepper used three comparable sales. The first *643 comparable sale was located in a Yazoo City suburban area which is similar in nature to the Holly Bluff area. The other two comparable sales were in Yazoo City. Ms. Pepper did not make an adjustment for location because her research uncovered no sales data to support an adjustment for location. During the course of Ms. Pepper's appraisal of the Holly Bluff residence, David Hatchett made it clear that he wanted the appraisal to be as high as possible. Ms. Pepper's research indicated that the appropriate range of value was $ 73,000 to $ 76,000. After submitting her June 14, 1982, appraisal of $ 76,000 to the Hatchetts, Ms. Pepper received a telephone call from Mrs. Hatchett indicating that David Hatchett was unhappy with the appraisal value because he had expected the appraisal value to be higher. Before he purchased the Holly Bluff residence in 1986, Mr. Goodman contacted Ms. Pepper regarding the value of the residence. Accordingly, Ms. Pepper inspected the Holly Bluff residence for a second time in the spring of 1986. Upon her second inspection of the residence, the condition had deteriorated substantially. Mr. Goodman did not want a market appraisal of the residence from *644 Ms. Pepper, and Ms. Pepper was unwilling to estimate the value of the residence without performing a market appraisal. However, Ms. Pepper and Mr. Goodman discussed factors which would influence the value of the house, and Ms. Pepper indicated that the deterioration of the house would have reduced its value between 1982 and 1986 if all other factors were the same in 1982 and 1986. Fair Market Value of Decedent's Farmland
Decedent owned four parcels of farmland in Yazoo County, Mississippi, with a total of 253 acres. The four parcels are located near Holly Bluff, Mississippi, with parcel one (160 acres) and parcel two (40 acres) adjoining and being two and one-half miles northeast of Holly Bluff, parcel three (40 acres) being three miles southwest of parcels one and two, and parcel four (13 acres) being immediately north of Holly Bluff. The subject property consists of class three soil which does not drain well. Its highest and best use is farming. From 1972 to 1980, the subject property plus 99.76 acres of land owned by the decedent's wife was rented out for an average rent of $ 5,614 per year. On decedent's estate return, these parcels were valued at an April 10, 1982, alternate *645 valuation date value of $ 113,350. The fair market value of the subject property as of April 10, 1982, would be approximately the same as its fair market value as of October 10, 1981. Petitioner's expert, Joel Stevenson, has been a professional appraiser for 22 years. Mr. Stevenson is a general practitioner in the appraisal field and has appraised over 9,000 tracts, including over one million acres of farm and timber land. Mr. Stevenson graduated from Louisiana State University with a degree in agriculture in 1964 and did appraisal work for the Tennessee Valley Authority for five years. Mr. Stevenson is an MAI (Member American Institute of Real Estate Appraisers), a member of the National Board of Realtors and the Mississippi Board of Realtors, and is licensed by the state of Mississippi as a broker. Mr. Stevenson has held every office of the LouisianaMississippi Institute of Real Estate Appraisers, has served as a committee member on ten committees at the national level, and is currently a member of the governing council of the American Institute on the national level. Mr. Stevenson has testified 230 times as an appraisal expert in eight southeastern states, before both Federal *646 courts and state courts. Mr. Stevenson's only occupation is that of an appraiser; he makes around 300 appraisals a year, of which approximately 295 are real estate appraisals and 20 are farmland appraisals. He has made approximately 60 appraisals of farmland in Yazoo County, Mississippi, including 22 in 1986. Mr. Stevenson used the market data and income approaches to determine that the fair market value of decedent's farmland on October 10, 1981, was $ 176,000. In arriving at his estimate of value based on market data, Mr. Stevenson looked for sales of property having physical features, soil types, flooding conditions, and locations as comparable to the subject property as he could find, and then made necessary adjustments. Mr. Stevenson selected four sales which, after he made necessary adjustments for time, size, physical features, and location, indicated the fair market value per acre of the subject property as follows: Per
Sale
No. Acre
No.
Date
Acres
Price
Price
Time
Size
1
12/ 7/78
540 $ 270,000 $ 500.00
1.30
1.00
2
2/28/79
442 185,000
418.55
1.35
1.00
3
12/29/78
322.88
293,230
908.00
1.30
1.00
4
6/19/80
1660
1,660,000
1000.00
1.10
.80
*647 Indicated
Sale
Total
For
No.
Physical
Location
Adjust.
Subject
1
1.05
1.05
1.43
$ 715
2
.95 1.00
1.28
536
3
.80 .80 .83 754
4
.90 .90 .71 710
Comparable sale number one included 540 acres and was located approximately 16 miles northwest of the subject property. It was subject to flooding and possessed alligator clay soils with a soybean yield of 20 to 35 bushels per acre. Comparable sale number one was conveyed on December 7, 1978, for $ 500 an acre and the deed was recorded in Sharkey County, Mississippi. Comparable sale number two was located approximately 14 miles west of the subject property and contained 442 acres. Comparable sale number two was conveyed on February 28, 1979, for $ 418.55 per acre. Comparable sale number three, located in Sharkey County, contained 322.88 acres and was conveyed on December 29, 1978, for $ 908 an acre. Comparable sale number four, a 1,660-acre parcel located in Sharkey County west of the subject property, had a dowling clay soil and was conveyed on June 10, 1980, for $ 1,000 an acre. Based on these sales, giving most weight to sale number two because of its similarity *648 to the subject property in size and access, Mr. Stevenson concluded that the fair market value of the subject property was $ 700 per acre or $ 177,000 for the 253 acres. To value the subject property using the income approach, Mr. Stevenson used a one-fourth rent basis in which the return to the land is one-fourth of the net income the property produces. Mr. Stevenson used a soybean production of 30 bushels per acre and a soybean price of $ 6.00 per bushel. Mr. Stevenson multiplied 253 acres time 30 bushels an acre times $ 6.00 per bushel times one-fourth to arrive at a gross rent of $ 11,385. Mr. Stevenson then reduced the $ 11,385 by $ 500 for taxes, $ 800 for management, and $ 1,265 for lime cost and ditch maintenance to reach a net income of $ 8,823. [2] Mr. Stevenson then capitalized this $ 8,823 net income at five percent to arrive at a fair market value of $ 176,000 for the 253 acres. In the area of the subject property, leasing farmland for one-fourth its production is usual and customary. The subject property would produce an average *649 of 30 bushels of soybeans per acre under prudent management. The costs for taxes, management, lime, and ditch maintenance used by Mr. Stevenson are averages for the area. The five percent capitalization rate used by Mr. Stevenson was taken from a study of 178 Mississippi farms made by the Louisiana State University School of Banking of the South. In reconciling the fair market value of $ 177,000 derived under the market data approach and the fair market value of $ 176,000 derived under the income approach, Mr. Stevenson noted that adjustments were required under the market data approach and that no adjustments were required under the income approach. Mr. Stevenson therefore concluded that $ 176,000 was the October 10, 1981, fair market value of the subject property. Respondent's expert witness, John J. Boyett, has worked as a real estate appraiser for 18 and one-half years. Mr. Boyett has been employed as an appraiser with the Internal Revenue Service for three and one-half years. Prior to his employment with the Internal Revenue Service, Mr. Boyett was employed for four and one-half years as a multi-family appraiser with the U.S. Department of Housing and Urban Development, *650 for six years as a mortgage loan appraiser for the Prudential Insurance Company, and for five years as an assessment analyst with the Tennessee Public Service Commission. While employed with the Internal Revenue Service, Mr. Boyett has appraised real estate and personal property. While employed by the U.S. Department of Housing and Urban Development, Mr. Boyett primarily appraised existing multi-family housing projects and sites for future multi-family housing projects. While employed with the Prudential Insurance Company, Mr. Boyett appraised income producing property including shopping centers, office buildings, warehouses, convention hotels, and other commercial property. While employed with the Tennessee Public Service Commission, Mr. Boyett appraised utility property for the state of Tennessee. Mr. Boyett has a 1967 bachelor of science degree from the University of Tennessee in finance. Mr. Boyett has taken a number of additional appraisal-related courses from the American Institute of Real Estate Appraisers, the International Association of Assessing Officers, the University of Tennessee, and several other sources. Mr. Boyett took a course offered by the American Institute *651 of Real Estate Appraisers entitled "Investment Analysis" which primarily concentrated on the income approach method of appraisal. Mr. Boyett currently holds the designation of Certified Review Appraiser from the National Association of Review Appraisers and Mortgage Underwriters. During his 18 and one-half years as a real estate appraiser, Mr. Boyett has performed hundreds of real estate appraisals, including approximately 40 concerning farmland. However, Mr. Boyett had never valued Mississippi farmland before he valued decedent's farmland. In arriving at his fair market value in this case, Mr. Boyett considered using the cost approach, the income approach, and the market approach to value, and concluded that the only relevant method to use was the market approach. Mr. Boyett prepared the appraisal of the subject property by himself including contacting third parties, locating source documents, and physically inspecting the properties. Mr. Boyett personally inspected the farmland at issue, researched sources such as flood maps, aerial photos and ownership maps, and researched the title of the subject property. Mr. Boyett spent approximately 143 hours preparing his expert's report *652 in this case and an additional 80 hours preparing for trial. Mr. Boyett's determination of the fair market value of the farmland in question was based solely upon the market data approach. Mr. Boyett's comparable sale number one is located in western Yazoo County, Mississippi, five miles northeast of Holly Bluff. This parcel contains 160 acres and sold for $ 900 per acre on February 2, 1982. Mr. Boyett's comparable sale number two is located in western Yazoo County and eastern Sharkey County, Mississippi, and contains 423 acres. Sale number two sold for $ 1,000 per acre on December 29, 1978. Mr. Boyett's comparable sale number three is located in western Yazoo County, nine miles south of Holly Bluff. Sale number three contains 800 acres and sold on November 11, 1980, for $ 1,500 per acre. Mr. Boyett's comparable sale number four is located in western Yazoo County, two miles west of Holly Bluff. Sale number four, a 456-acre tract, sold for $ 946 per acre on April 5, 1983. Mr. Boyett's comparable sale number five is a 274-acre parcel located in western Yazoo County, two miles east of Holly Bluff. Sale number five is 84 percent wooded and sold for $ 455 per acre on September 25, 1980. *653 All comparable sales information used by Mr. Boyett in his appraisal came from third party sources that he considered reliable. Mr. Boyett spoke directly to the grantor with regard to comparable sale number two. Mr. Boyett made a slight overall adjustment to sale number one based on its poor soil quality, which left an adjusted value of $ 1,000 an acre. Mr. Boyett made a strong upward adjustment to comparable sale number two to reach an adjusted value of $ 1,200 per acre. Mr. Boyett made an overall upward adjustment for time to comparable sale number three to arrive at an adjusted value of approximately $ 1,700 per acre. Mr. Boyett made an upward adjustment to comparable sale number four to arrive at an adjusted value of approximately $ 1,100 per acre. Mr. Boyett included comparable sale number five to show the price at which woodland property near the subject property was selling. Based on his comparable sales, Mr. Boyett valued decedent's farmland as of October 10, 1981, at $ 1,100 per acre or a total of $ 278,000. Jointly Owned Property
Mrs. Hatchett inherited 99.76 acres of land from her father in 1966. Upon her father's death, his property was partitioned and each *654 of his children received a specified tract of land. In April 1967, Mrs. Hatchett exchanged the land she inherited from her father with the land her sister, Nina Y. Davis, inherited. The land Mrs. Hatchett received from her sister also consisted of 99.76 acres. After the exchange of land, Mrs. Hatchett treated the land she received as her own property, and the taxes on the property were assessed to her. From the time Mrs. Hatchett received the land until 1971, decedent farmed the 99.76 acres owned by his wife in addition to his own 253 acres. Mrs. Hatchett's 99.76 acres were of better quality than decedent's 253 acres. When he retired from farming in 1972, decedent rented his 253 acres and his wife's 99.76 acres to H & S Farms. H & S Farms consisted of Buddy Hatchett, Russell Hatchett, Arthur Singleterry, and Odell Singleterry. In 1980, Buddy Hatchett split off from H & S Farms and farmed both decedent's and Mrs. Hatchett's land on his own. Buddy Hatchett is the present lessee of Mrs. Hatchett's 99.76 acres and decedent's 253 acres. Until the death of decedent, the rental payment for decedent's and Mrs. Hatchett's land was made in a single check payable to R. J. Hatchett. The *655 leases for both the decedent's and Mrs. Hatchett's land were oral. The following schedule indicates the amount of rent paid for both the decedent's and Mrs. Hatchett's land: 1972
$ 3,876
1973
3,485
1974
4,840
1975
4,900
1976
4,900
1977
5,390
1978
7,620
1979
7,621
1980
7,890
At various times between 1973 and 1975, the Hatchetts acquired four certificates of deposit with a total face value of $ 42,592.77 that they held jointly. During 1974 and 1975, Mrs. Hatchett acquired three certificates of deposit solely in her name with a total face value of $ 40,000. These seven certificates of deposit were renewed annually at the same interest rate and held until May 9, 1980, at which time the certificates were combined to earn a higher interest rate. The amount of $ 37,978.33 was rolled over from the four certificates held jointly and $ 40,358.33 was rolled over from the three certificates held by Mrs. Hatchett solely. The seven certificates were rolled over into four new certificates with a total face value of $ 90,000 on May 9, 1980. The four new certificates of deposit were owned by decedent and Mrs. Hatchett as joint tenants with right of survivorship. *656 These four certificates of deposit were reported on Schedule E of decedent's estate tax return, and one-half of their value of $ 99,450 was included in decedent's gross estate on the return. Property Interest Passing to Decedent's Surviving Spouse
Decedent's will, executed in 1967, included the following provisions: Item 3. I do hereby will, devise, and bequeath unto my beloved wife, Theressa Yankee Hatchett, for the period of her natural life, all real estate, all stocks, other than that of the Price Gas Company, all bonds, notes, debts and accounts due me, and all of my life insurance, and cash on hand and in banks; and all farm equipment, farm supplies, growing or matured crops, and all other personal property, that I might die seized and possessed of, other than that disposed of in Item 2 hereof. I do hereby especially grant unto my wife the right and power to use, consume or dispose of any portion of my personal properties herein bequeathed unto her as she may find necessary for her comfort, maintenance or convenience. Item 4. I do hereby request and recommend to my wife that in the renting, sale, disposition, investment, and handling of her properties *657 devised and bequeathed to her, that she consult with and seek the advise of our son, R. J. Hatchett, Jr., our grandsons, R. J. Hatchett, III, and David Hatchett, and my attorney, T. H. Campbell, Jr. Item 5. I do hereby will, devise and bequeath in equal shares unto my son, Richard J. Hatchett, Jr., his wife Dorothy Hatchett, and his sons, Richard J. Hatchett, III, David H. Hatchett, and Paul Hatchett, the remainder interest after the death of my wife, in and to all the real and personal property devised and bequeathed to my wife in Item 3 of this will. David Hatchett, decedent's grandson and the executor of decedent's estate, is a certified public accountant. Following his graduation from Mississippi State University in 1969, he was employed as a tax accountant in Houston, Texas, by Arthur Anderson & Company until approximately July 1979. David Hatchett had an extremely close relationship with his grandfather. In his discussions with David Hatchett, decedent instructed David that he did not want his wife to feel that she had to answer to anyone regarding any money she spent for whatever purpose she might want to spend it on. The decedent was particularly concerned that *658 if a bank or some other party other than a family member were the executor of his estate, she would be required to explain why she needed money. The decedent wanted his surviving spouse to live with the same convenience that she had during his lifetime. Decedent asked David Hatchett to serve as executor of his estate in part because of David Hatchett's intimate familiarity with decedent's financial affairs. ULTIMATE FINDINGS OF FACT The fair market value of decedent's residence on April 10, 1982, was $ 76,000. The fair market value of decedent's farmland on April 10, 1982, was $ 176,000. OPINION Value of Residence
The first issue for decision is the value of decedent's residence. Decedent's residence was valued on his estate tax return at an April 10, 1982, alternate valuation date fair market value of $ 76,000. The $ 76,000 fair market value was based on an appraisal by Reba Pepper. Petitioner now contends that the correct fair market value of decedent's residence on April 10, 1982, was approximately $ 52,000. Petitioner bears the burden of proof on this issue. Rule 142(a). It is well settled that *659 the valuation of an asset in a tax return is an admission by the taxpayer when that valuation is inconsistent with a subsequent position taken by the taxpayer. McShain v. Commissioner, 71 T.C. 998, 1010 (1979); Waring v. Commissioner, 412 F.2d 800, 801 (3d Cir. 1969), affg. per curiam a Memorandum Opinion of this Court; Grill v. United States, 303 F.2d 922, 926 (Ct. Cl. 1962); Campagna v. United States, 290 F.2d 682 (2d Cir. 1961); Estate of Marsack v. Commissioner, 288 F.2d 533, 536 (7th Cir. 1961), affg. a Memorandum Opinion of this Court. It is equally well settled that such admission is not conclusive and that the trier of fact is entitled to determine, based on all the evidence, what weight, if any, should be given to the admission. McShain v. Commissioner, supra; Waring v. Commissioner, supra; Estate of Kreis v. Commissioner, 227 F.2d 753 (6th Cir. 1955), affg. a Memorandum Opinion of this Court; Roche v. Commissioner, 63 F.2d 623, 624 (5th Cir. 1933), affg. 21 B.T.A. 1139 (1931); Bedell v. Commissioner, 30 F.2d 622, 625 (2d Cir. 1929), *660 affg. 9 B.T.A. 270 (1927). Property includable in a decedent's gross estate is included at its fair market value either as of the date of the decedent's death or as of the alternate valuation date as provided in section 2032. Secs. 2031(a) and 2032; sec. 20.2031-1(b), Estate Tax Regs. Fair market value is the "price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." Sec. 20.2031-1(b), Estate Tax Regs.; United States v. Cartwright, 411 U.S. 546, 551 (1973); Estate of Hall v. Commissioner, 92 T.C. 312 (1989); Estate of Heckscher v. Commissioner, 63 T.C. 485, 490 (1975). The willing seller and buyer are hypothetical rather than specific individuals or entities. Estate of Bright v. United States, 658 F.2d 999, 1005-1006 (5th Cir. 1981). The determination of value is to be made as of the valuation date and knowledge of future events that may have affected the value *661 cannot be attributed to the hypothetical buyer or seller. Sec. 20.2031-1(b), Estate Tax Regs. Petitioner has two main arguments in support of its contention that the fair market value of decedent's residence was $ 52,000. First, petitioner contends that Ms. Pepper's appraisal was inaccurate because she used comparable sales in and around Yazoo City and did not adequately adjust the value of these sales for the fact that decedent's residence was located in Holly Bluff. Petitioner introduced evidence that Yazoo City was approximately 25 to 30 miles away from Holly Bluff, that Yazoo City was a larger community than Holly Bluff, that Holly Bluff had no hospital, police department, fire department, or sewage system, and that Yazoo City was the shopping and employment center of Yazoo County. Petitioner contends that these facts make the sales chosen by Ms. Pepper as comparable sales irrelevant in determining the value of the decedent's residence in Holly Bluff. However, petitioner offered no expert testimony or any other evidence to support its position that the differences between Yazoo City and Holly Bluff would have any impact upon the fair market value of the residence. In the *662 absence of any such expert testimony or other evidence, petitioners have failed to demonstrate that the differences between Yazoo City and Holly Bluff would make the appraisal of decedent's residence inaccurate because it was based on comparable sales in and around Yazoo City. Petitioner's second argument is that because decedent's residence was on the market from 1982 to 1986 and was ultimately sold for $ 52,000, the fair market value of the residence in 1982 was $ 52,000. Petitioner states that "it would appear to be but a truism to say that the value of such residence was never more than the largest amount for which it could have been sold. The evidence indicates that $ 52,000 was the largest amount for which it could have been sold * * *." In effect, petitioner is contending that because Mr. Goodman was the only person willing to buy decedent's residence and because Mr. Goodman was only willing to pay $ 52,000 in 1986, the fair market value when the property was first offered for sale was $ 52,000. Petitioner's argument depends on the "willing buyer" being Mr. Goodman. However, the "willing buyer" in the fair market value definition is hypothetical, not a specific individual. *663 Estate of Bright v. United States, supra at 1005-1006. On the evidence before the Court, we are not convinced that a hypothetical "willing buyer" would have only been willing to pay $ 52,000 in 1982. The fact that Mr. Goodman was only willing to pay $ 52,000 in 1986 after the house had deteriorated and the Holly Bluff economy had declined does not mean that Mr. Goodman or someone else would not have been willing to pay more earlier. The record reflects that Mr. Goodman and the Hatchetts negotiated for two and one-half years before Mr. Goodman purchased decedent's residence. However, the record does not reflect any specifics about these negotiations. For all we know, Mr. Goodman may have been willing to pay more than $ 52,000 before 1986 and the Hatchetts may have been unwilling to accept his offer at that time. Mr. Goodman and the Hatchetts may both have lowered their price when the house deteriorated and the economy declined. Therefore, we cannot assume that the 1982 fair market value of the residence was $ 52,000 just because the residence was sold for $ 52,000 in 1986. The evidence before the Court shows that between 1982 and 1986 the house deteriorated *664 substantially. In addition, the farm economy around Holly Bluff had declined between 1982 and 1986. A declining farm economy would have had an adverse impact on the value of the house even if it had not experienced substantial deterioration. We find little evidence in the record showing that the value of decedent's residence was less than $ 76,000 on April 10, 1982. Accordingly, we give great weight to petitioner's admission on decedent's estate tax return that decedent's residence was worth $ 76,000 on April 10, 1982. Consequently, we find that the fair market value of decedent's residence on April 10, 1982, was $ 76,000. Fair Market Value of Decedent's Farmland
The second issue for our decision is the fair market value of decedent's farmland. Decedent's 253 acres of farmland were valued on his estate tax return at an April 10, 1982, alternate valuation date fair market value of $ 113,350. Respondent determined that the April 10, 1982, fair market value of the 253 acres of farmland was $ 253,000. On brief, petitioner contends that the fair market value of decedent's farmland on April 10, 1982, was $ 176,000. On brief, respondent contends that the value of the 253 *665 acres of farmland on April 10, 1982, was $ 278,000. The burden of proof is upon petitioner to establish that the fair market value of the farmland in issue is less than $ 253,000 as determined by respondent and upon respondent to establish that the fair market value of the farmland in issue is greater than $ 253,000. Rule 142(a). As we stated earlier, property includable in a decedent's gross estate is included at its fair market value either as of the date of the decedent's death or as of the alternate valuation date as provided in section 2032. Secs. 2031(a) and 2032; sec. 20.2031-1(b), Estate Tax Regs. Fair market value is the "price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." Sec. 20.2031-1(b), Estate Tax Regs.; United States v. Cartwright, supra; Estate of Hall v. Commissioner, supra; Estate of Heckscher v. Commissioner, supra.
Petitioner and respondent each rely upon valuations prepared by their respective experts. Expert opinion is admissible if it will *666 assist the trier of fact to understand evidence that will determine the fact in issue. See Fed. R. Evid. 702. The trier of fact must weigh such evidence in light of the demonstrated qualifications of the expert and all other credible evidence. Estate of Christ v. Commissioner, 480 F.2d 171, 174 (9th Cir. 1973), affg. 54 T.C. 493 (1970). We are not bound by the opinion of any expert witness when that opinion is contrary to our judgment. Estate of Kreis v. Commissioner, supra at 755. We may embrace or reject expert testimony, whichever, in our best judgment, is appropriate. Helvering v. National Grocery Co., 304 U.S. 282 (1938). Petitioner's expert, Mr. Stevenson, is experienced at valuing property in the area of the subject property. Mr. Stevenson has made approximately 60 farmland appraisals in Yazoo County including 22 in 1986. Respondent's expert, Mr. Boyett, has made 40 farmland appraisals in his lifetime, but has never before made an appraisal of Mississippi farmland. Both Mr. Stevenson and Mr. Boyett valued *667 decedent's farmland as of decedent's date of death, October 10, 1981, rather than as of the alternate valuation date, April 10, 1982. However, Mr. Stevenson testified, and we found as a fact, that the fair market value of decedent's farmland would be about the same on April 10, 1982, as on October 10, 1981. Therefore, the expert reports and testimony regarding the value on October 10, 1981, are relevant to our decision as to the April 10, 1982, value of decedent's farmland. The most significant difference between Mr. Stevenson's and Mr. Boyett's approaches to the valuation of the subject property was that Mr. Stevenson used both the market approach and the income approach, whereas Mr. Boyett used only the market approach. Mr. Boyett testified that the use of the income approach in valuing farmland (which Mr. Boyett referred to as "vacant land") was inappropriate unless no good comparable sales were available. Mr. Boyett testified on the subject of the income approach to valuation that "I've also tried to apply it of farmland before. I've talked with a lot of other appraisers. I've never found one that thought it was applicable. I've never seen one until today." However, a book *668 published by the American Institute of Real Estate Appraisers, The Appraisal of Rural Property 171 (1983), states that the income capitalization approach to value may be used in valuing farmland. The Appraisal of Rural Property, supra at 171, states as follows: The income capitalization approach to value is a procedure through which anticipated economic benefits are converted into a value estimate; it is a basic tool for the valuation of income-producing properties. This approach is used to analyze the returns realized from future benefits to the owner of a farm or other income-producing rural properties. The income capitalization approach reflects the relationship between the annual net earnings of an interest in property and the value or sale price of that interest. It is based on the principle of anticipation reflected in the definition of value as the present worth of the rights to future benefits accruing to ownership. In rural properties used for agricultural production, the income capitalization approach is significant in the estimation of value. The rural appraiser is primarily concerned with earnings from the land, that is, the annual cash flow from farm production. *669 Respondent has introduced no evidence, other than Mr. Boyett's testimony, that the income approach to valuation should not be used for farmland. In support of his contention, Mr. Boyett claimed "that an appraisal of any kind of vacant land, that the market approach is basic to the appraisal of that type of property. Any other approaches should only be considered in the absence of good comparable sales." However, as petitioner points out on brief, The Appraisal of Real Estate 348 (8th ed. 1983) states that "the value of any interest in real property that has an income can be estimated by the income capitalization approach." In addition, The Appraisal of Real Estate, supra at 500, contains the following statement on the subject of the choice of valuation methods: "If the subject property were income-producing, the income capitalization approach would probably be considered more appropriate than the sales comparison or cost approaches." This statement directly contradicts Mr. Boyett's testimony. Based on our research, the statement in The Appraisal of Rural Property, supra, and Mr. Stevenson's testimony, we are convinced that the income approach to valuation is appropriate *670 in valuing productive farmland. We are inclined to believe that Mr. Boyett's testimony to the contrary was the result of both his lack of knowledge and his bias in favor of respondent. Mr. Boyett appeared to confuse productive farmland with unproductive vacant land. Clearly, unproductive vacant land cannot be valued using the income approach to valuation because there is no income stream to capitalize. However, Mr. Boyett was unable to adequately explain why productive farmland with a stream of income cannot be valued using the income approach. Mr. Boyett's bias in favor of respondent was apparent both in his stubborn advocacy of his position on the use of the income approach and in disparaging and denigrating testimony by Mr. Boyett regarding Mr. Stevenson. [3] Mr. Boyett's testimony convinced us that Mr. Boyett was acting as an advocate for respondent rather than as an expert. In this regard, the purpose of expert testimony is to assist the trier of fact to understand evidence that will determine the fact in issue. See Rule 702, Fed. R. Evid.When an expert assumes the position of an *671 advocate, this purpose is in jeopardy and the Court is not aided in its ultimate determination. See Laureys v. Commissioner, 92 T.C. 101, 122-129 (1989). [4] Accordingly, we find Mr. Boyett to be biased and we disregard and reject his expert report and testimony for purposes of deciding the value of decedent's farmland.
*672 We find Mr. Stevenson to be a credible witness and a qualified expert appraiser. Accordingly, we accept Mr. Stevenson's valuation of the farmland as being $ 176,000 on October 10, 1981. The value of the farmland on April 10, 1982, would have been about the same as the value on October 10, 1981. Consequently, we conclude that the April 10, 1982, value of the farmland at issue for estate tax purposes was $ 176,000. Section 2040(a)
The next issue to be decided is whether petitioner is entitled to exclude from decedent's gross estate one-half of the value of certain jointly owned certificates of deposit. On decedent's estate tax return, petitioner excluded $ 49,725 (one-half of the value of four certificates of deposit totalling $ 99,450) from decedent's gross estate. Respondent determined that petitioner was not entitled to this exclusion. Under section 2040(a), the value of a decedent's gross estate includes the entire value of property held by the decedent as a joint tenant except such part thereof as may be shown to have originally belonged to such other person and never to *673 have been received or acquired by the latter from the decedent for less than an adequate and full consideration in money or money's worth: Provided, That where such property or any part thereof, or part of the consideration with which such property was acquired, is shown to have been at any time acquired by such other person from the decedent for less than an adequate and full consideration in money or money's worth, there shall be excepted only such part of the value of such property as is proportionate to the consideration furnished by such other person * * *. Section 20.2040-1(a), Estate Tax Regs., states that (a) In general. A decedent's gross estate includes under section 2040 the value of property held jointly at the time of the decedent's death by the decedent and another person or persons with right of survivorship, as follows: (1) To the extent that the property was acquired by the decedent and the other joint owner or owners by gift, devise, bequest, or inheritance, the decedent's fractional share of the property is included. (2) In all other cases, the entire value *674 of the property is included except such part of the entire value as is attributable to the amount of the consideration in money or money's worth furnished by the other joint owner or owners. See section 20.2043-1 with respect to adequacy of consideration. Such part of the entire value is that portion of the entire value of the property at the decedent's death (or at the alternate valuation date described in section 2032) which the consideration in money or money's worth furnished by the other joint owner or owners bears to the total cost of acquisition and capital additions. In determining the consideration furnished by the other joint owner or owners, there is taken into account only that portion of such consideration which is shown not to be attributable to money or other property acquired by the other joint owner or owners from the decedent for less than a full and adequate consideration in money or money's worth. The entire value of jointly held property is included in a decedent's gross estate unless the executor submits facts sufficient to show that property was not acquired entirely *675 with consideration furnished by the decedent, or was acquired by the decedent and the other joint owner or owners by gift, bequest, devise, or inheritance. Accordingly, under section 20.2040-1(a), Estate Tax Regs., the entire value of the certificates of deposit at issue must be included in decedent's gross estate unless the executor, David Hatchett, has submitted facts sufficient to show that part of the consideration for the certificates of deposit at issue was provided by Mrs. Hatchett and that her consideration was not attributable to money or other property acquired from the decedent. Petitioner bears the burden of proving that respondent's determination on this issue is incorrect. Rule 142(a). Briefly stated, petitioner claims that Mrs. Hatchett's contribution towards the certificates of deposit at issue came from rents received on property she received as a result of an inheritance from her father and from three certificates of deposit owned solely by Mrs. Hatchett. Respondent contends that petitioner has failed to trace any separate assets of Mrs. Hatchett to the certificates of deposit at issue. Thus, respondent claims that petitioner has not carried its burden of proof *676 and that the full value of the jointly held property must be included in decedent's gross estate. Petitioner argues that the tracing requirement is satisfied for at least $ 40,358.33 because the certificates of deposit owned solely by Mrs. Hatchett were presumed to be hers under state law and these certificates of deposit were worth $ 40,358.33 when they were rolled over into the certificates of deposit at issue. However, in determining what consideration was furnished by Mrs. Hatchett, only the consideration which petitioner can show was not attributable to money or other property acquired by Mrs. Hatchett from the decedent is taken into account. Sec. 20.2040-1(a), Estate Tax Regs. Therefore, the $ 40,358.33 is only treated as consideration furnished by Mrs. Hatchett to the extent petitioner can show that the $ 40,358.33 is not attributable to money or other property Mrs. Hatchett received from decedent. Petitioner introduced evidence to show that Mrs. Hatchett received 99.76 acres of farmland as a result of an inheritance from her father. Decedent farmed his wife's 99.76 acres from 1967 to 1971, along with his own 253 acres of farmland. From 1972 until decedent's death, Mrs. *677 Hatchett's 99.76 acres were rented out along with the farmland belonging to decedent. Petitioner introduced evidence showing the amounts of rent received for the 99.76 acres and the 253 acres combined. Petitioner also introduced evidence that Mrs. Hatchett's farmland was of better quality than decedent's farmland. From this evidence it is possible to estimate the amount of the consideration for the certificates of deposit at issue traceable to assets of Mrs. Hatchett that she did not receive from decedent. Richardson v. Commissioner, 80 F.2d 548 (D.C. Cir. 1935), provides support for our making this estimation. In Richardson v. Commissioner, supra, the surviving spouse received money as gifts from her parents and for services she rendered in her husband's medical practice. The surviving spouse turned these funds over to her husband who deposited them in the one bank account they maintained. With these funds, her husband invested in various real properties for various periods of time, subsequently selling the properties and investing the proceeds in other properties. The deeds in all of the properties were held jointly. The record contained *678 testimony that the surviving spouse had contributed as much toward the properties as her husband had. The Court of Appeals for the District of Columbia held that one-half of the value of the real estate at the date of the husband's death should be excluded from the husband's gross estate. In the instant case, petitioners have proven that Mrs. Hatchett had her own source of income from 1966 until decedent's death. In each year, Mrs. Hatchett's income was the rental value of her property. When decedent farmed her property, Mrs. Hatchett was in effect contributing the rental value of her property towards the family enterprise. After decedent stopped farming, part of the rental income earned on Mrs. Hatchetts and decedent's farmland was attributable to Mrs. Hatchett's property. Accordingly, we are convinced that at least part of the value of the three certificates of deposit owned solely by Mrs. Hatchett was attributable to the property she received as a result of the inheritance from her father. Mrs. Hatchett owned less farmland than decedent, but her land was of better quality. Petitioner argues that 30 to 40 percent of the rental income was attributable to Mrs. Hatchett's property. *679 Nevertheless, since petitioner, by its failure to produce adequate records, created the need for an approximation, we will bear heavily against petitioner in our approximation. See Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930). Accordingly, we find that one-quarter (1/4) of the $ 40,000 consideration for the three certificates of deposit solely owned by Mrs. Hatchett was attributable to the property Mrs. Hatchett received as a result of an inheritance from her father. In addition, we note that the certificates of deposit owned solely by Mrs. Hatchett had a total face value of $ 40,000 but were worth $ 40,358.33 when they were rolled over into the certificates of deposit at issue in this case. It is well settled that income from property owned solely by a surviving joint tenant constitutes the separate property of the surviving joint tenant for purposes of section 2040(a) even if the property itself was acquired as a gift from the decedent. Harvey v. United States, 185 F.2d 463 (7th Cir. 1950). Therefore, the income earned by Mrs. Hatchett *680 on her solely owned certificates of deposit is Mrs. Hatchett's separate property for purposes of section 2040(a). When Mrs. Hatchett's solely owned certificates of deposit were rolled over, their value included $ 358.33 of income earned by Mrs. Hatchett. Therefore, at least $ 358.33 of the consideration for the certificates of deposit at issue is traceable to Mrs. Hatchett's separate property. Therefore, petitioners have met their burden of proof with respect to the $ 358.33 of income earned on Mrs. Hatchett's solely owned certificates of deposit. Petitioner contends that the evidence shows that Mrs. Hatchett contributed at least half of the consideration for the four certificates of deposit owned jointly by decedent and Mrs. Hatchett at decedent's death. So far, we have found that, of the $ 40,358.33 worth of certificates of deposit rolled over into the certificates of deposit at issue, $ 10,358.33 is attributable to property Mrs. Hatchett received as a result of an inheritance from her father. Since the certificates of deposit at issue had a total face value of $ 90,000, $ 49,641.67 worth of consideration for the certificates at issue remains to be accounted for. Based on *681 the evidence presented by petitioner, we are convinced that part of the remaining $ 49,641.67 of consideration is attributable to Mrs. Hatchett's income from her 99.76 acres. Nevertheless, as we previously stated, since petitioner created the need for an approximation by its failure to produce adequate records, we will bear heavily against petitioner in our approximation. See Cohan v. Commissioner, supra.Accordingly, we find that petitioners have proven that one-quarter (1/4) of the $ 49,641.67 of consideration not previously accounted for was attributable to the property Mrs. Hatchett inherited from her father. Section 2056(b)(5)
The final issue for our decision is whether a power of appointment bequeathed to Mrs. Hatchett in decedent's will is exercisable in all events. Petitioner claimed a section 2056(b)(5) marital deduction for the value of certain items of personal property on decedent's estate tax return. Respondent disallowed this marital deduction on the basis that the power of appointment at issue was not exercisable by Mrs. Hatchett in all events. *682 The burden of proof is upon petitioner to establish that the power of appointment at issue satisfies the general power of appointment standard of section 2056(b)(5). Rule 142(a). Under section 2056(a), the value of the taxable estate is determined by deducting from the value of the gross estate an amount equal to the value of any interest in property passing from the decedent to his surviving spouse, but only to the extent that such interest is included in determining the value of the gross estate. This deduction is known as the marital deduction. An estate is entitled to the marital deduction only with respect to a qualifying property interest passed from the decedent to his surviving spouse. A terminable interest in property may not qualify for the marital deduction. Sec. 2056(b)(1). Section 20.2056(b)-1(b), Estate Tax Regs., defines a "terminable interest" as "an interest which will terminate or fail on the lapse of time or on the occurrence or the failure to occur of some contingency, *683 " specifically referring to a life estate as an example of such an interest. Under section 2056(b)(1), a terminable interest in property will not qualify for the marital deduction if (1) another interest in the same property passed from decedent to some other person for less than adequate consideration and (2) by reason of its passing, such other person or his heirs or assigns may possess or enjoy any part of the property after the termination of the spouse's interest. Congress only intended to allow the marital deduction to a decedent's estate in those situations where the qualifying property interest "will be includible in the gross estate of the beneficiary or donee spouse unless it has been dissipated in the interval." S. Rept. No. 1013, 80th Cong., 2d Sess. (1948), 1948-1 C.B. 285, 305. See also Estate of Holland v. Commissioner, 64 T.C. 499, 502 (1975). Thus, the statute was designed so as to prevent qualifying property from escaping the estate tax a second time. Section 2056(b)(5) provides an exception to the terminable interest rule where a decedent *684 passes a life estate to a surviving spouse together with a power in the spouse alone to appoint the entire interest received to himself or his estate. See sec. 20.2056(b)-5, Estate Tax Regs. This power must be exercisable by the surviving spouse alone and must be exercisable by her in all events. Sec. 20.2056(b)-5, Estate Tax Regs. Under the section 2056(b)(5) exception, the life estate qualifies for the marital deduction because the property interest passes completely to the surviving spouse and is includable in the gross estate of the surviving spouse unless disposed of in the interim. S. Rept. No. 1013, supra; Estate of Holland v. Commissioner, supra at 503. Where a surviving spouse receives an interest in property under the decedent's will, the interest passing to such spouse must be ascertained from the will itself. Estate of Holland v. Commissioner, supra at 503. Whether the property interest so passing constitutes a disqualified terminable interest must be determined as of the time of the decedent's death considering the law *685 of the jurisdiction under which the interest passes. Commissioner v. Estate of Bosch, 387 U.S. 456 (1967); Estate of Abely v. Commissioner, 60 T.C. 120, 123 (1973), affd. 489 F.2d 1327 (1st Cir. 1974). In the instant case, we must look to the law of Mississippi to determine the nature of the property interest passing to the decedent's spouse. Two clauses in the decedent's will are pertinent for the determination of this issue: Item 3. I do hereby will, devise, and bequeath unto my beloved wife, Theressa Yankee Hatchett, for the period of her natural life, all real estate * * * [specifically enumerated personal property] that I might die seized and possessed of, other than that disposed of in Item 2 hereof. I do hereby especially grant unto my wife the right and power to use, consume or dispose of any portion of my personal properties herein bequeathed unto her as she may find necessary for her comfort, maintenance or convenience. * * * Item 5. I do hereby will, devise and bequeath in equal shares unto my son, Richard J. Hatchett, Jr., his wife Dorothy Hatchett, and his sons, Richard J. Hatchett, III, David *686 H. Hatchett, and Paul Hatchett, the remainder interest after the death of my wife, in and to all the real and personal property devised and bequeathed to my wife in Item 3 of this will. The parties agree that the issue to be decided is whether the power to use, consume, or dispose of property by the surviving spouse as she may find necessary for her comfort, maintenance, or convenience is a power exercisable in all events. The parties agree that if the will only contained the power to use, consume, or dispose of property as necessary for the surviving spouse's comfort and maintenance, the power would not be exercisable in all events and no marital deduction would be allowed. Sec. 20.2056(b)-5(g)(3), Estate Tax Regs.; Estate of Noble v. Commissioner, 31 T.C. 888 (1959). However, the parties disagree on the effect of the term "convenience" in the will of the decedent. Petitioner argues that "convenience" has such a broad definition that there is no restriction on Mrs. Hatchett's ability to use, consume, or dispose of the property. Respondent, on the other hand, takes the position that the use of the term "convenience" does not remove all restrictions on the surviving *687 spouse's ability to use, consume, or dispose of the property. Neither party could find any Mississippi case law or case law from any other state specifically interpreting the word "convenience" in a power of appointment situation, and our own independent research has revealed no such case. It is well settled that the duty of Mississippi courts in construing wills is to ascertain and give effect to the intention of the testator. Malone v. Malone, 379 So.2d 926 (Miss. 1980). In ascertaining this intention, the court must consider the entire will. Malone v. Malone, supra at 928. In addition, effect should be given, if possible, to all words, clauses, and provisions of the instrument. "A Will must be construed and the testator's intention ascertained from the usual and ordinary language expressed therein. The words of a Will are to be construed according to the rules of construction applicable to the ordinary speech, except when technical terms are employed." Hemphill v. Robinson, 355 So.2d 302, 306 (Miss. 1978). The word "convenience" *688 is defined in Webster's New International Dictionary (2d ed. 1953), [5] in pertinent part, as follows: 1. Agreement; harmony; congruity; aptitude. * * * 2. Quality of being convenient; fitness or suitableness. * * * 3. Freedom from discomfort, difficulty, or trouble; personal comfort; accommodation; as, to consider one's own convenience. * * * 4. A convenient or fit condition or time; an opportunity or advantage; as, at your earliest convenience. 5. That which promotes comfort or advantage; something suited to one's material wants * * *. The word "convenience" is therefore closely allied with the word "comfort." In its ordinary and grammatical sense, the word "convenience" is nearly synonymous with the word comfort and is not the broad concept which petitioners assert. Accordingly, the addition of the term "convenience" to the *689 terms "comfort" and "maintenance" does not change what would otherwise be a restricted power of appointment into an unrestricted power of appointment. A power of appointment exercisable as necessary for the surviving spouse's comfort, maintenance, or convenience is therefore a restricted power. A restricted power is not exercisable in all events. Sec. 20.2056(b)-5(g)(3), Estate Tax Regs. Consequently, the power of appointment at issue was not exercisable by Mrs. Hatchett in all events and petitioner is not entitled to the section 2056(b)(5) marital deduction. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect as of the date of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. We note that $ 11,385 minus $ 500, $ 800, and $ 1,265 equal $ 8,820; however, Mr. Stevenson used the figure $ 8,823 in his report.↩
3. Mr. Boyett testified that "I would say that in 18 and a half years of real estate appraisal experience the inclusion of these sales is the most absurd, unethical thing I've seen a real estate appraiser do. Neither of them are arms-length transactions." The only evidence before the Court suggesting that any of Mr. Stevenson's comparable sales were not arm's-length was Mr. Boyett's testimony, which we found to be incredible. We found no credible evidence in the record that Mr. Stevenson was anything but a highly ethical appraiser or that Mr. Stevenson's comparable sales were anything but arm's length. ↩
4. See also Jacobson v. Commissioner, T.C. Memo. 1989-606, slip op. p. 15-16; Ferrari v. Commissioner, T.C. Memo. 1989-521; and Mathis v. Commissioner, T.C. Memo. 1989-254 (57 T.C.M. 519↩, 527; 58 P-H Memo T.C. par. 89,254 at 1246).
5. The second edition of Webster's New International Dictionary was the current edition when decedent executed his will in 1967. The third edition, published in 1981, has no significant change in the definition of the word "convenience."↩